## TALBOT MILLS v. COMMISSIONER OF INTERNAL REVENUE.

No. 4015.

Circuit Court of Appeals, First Circuit.

Dec. 22, 1944.

Melville F. Weston and Powers & Hall, all of Boston, Mass. (Clare V. Stanton, of Newton, Mass., of counsel), for petitioner for review.

John F. Costelloe, of Washington, D. C., and Samuel O. Clark, Jr., Asst. Atty., Gen., Sewall Key, J. Louis Monarch, and Harry Baum, Sp. Assts. to the Atty. Gen., J. P. Wenchel, Chief Counsel, and Charles E. Lowery, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for the Commissioner.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAHONEY, Circuit Judge.

In its income and excess profits tax returns for the fiscal year ending September 30, 1940, the taxpayer, Talbot Mills, deducted the sum of $40,000 accrued as interest upon certain "registered notes." The Commissioner of Internal Revenue disallowed the deduction on the ground that it did not represent interest within the meaning of § 23(b) of the Revenue Act of 1938, 52 Stat. 447, 26 U.S.C.A. Internal Revenue Code, § 23(b). The Tax Court of the United States sustained the determination of the Commissioner and concluded "that the 'registered notes' were more in the nature of a capital investment than a loan to the corporation, and payments made as 'interest' are not deductible." 3 T.C. 95, 100. The petition for review presents the question whether the payments were dividends or interest.

The taxpayer is a Massachusetts corporation engaged in the manufacture of woven woolen and worsted fabrics. It keeps its books and files its tax returns on the accrual basis. Prior to the beginning of its fiscal year ending September 30, 1940, the taxpayer had outstanding 5,000 shares of $100 par common stock, or a total capital stock of $500,000, and a surplus appearing on its books of $472,754.18. The stock was held by fifteen stockholders who, with the exception of one holder of ten shares to qualify as a director, were either members of the Talbot family, or trusts created by such members. For several years prior to 1937 the taxpayer had been operating at a loss, and in that year the question of liquidation was up for discussion among the stockholders. They decided to stay in business and to take steps towards improving their "competitive condition" such as renovation of the plant and a drastic reorgani-

zation of personnel. The possibility of recapitalization was also discussed at that time, and in 1939 the treasurer was authorized "to retain counsel to examine the capital structure of the company with the view to seeing if any modification can be made in same to the advantage of the company." In September of that year a plan of reorganization was submitted to and adopted by the directors, and on September 29, 1939, it was adopted unanimously by the stockholders. Under the plan each stockholder was to surrender four-fifths of his stock in exchange for "registered notes" of a face amount equal to the par value of the stock surrendered. Pursuant thereto the fifteen stockholders turned in $400,000 of the outstanding $100 par value capital stock, and each received in exchange a share of the $400,000 in notes proportionate to the amount of stock he turned in.

The notes are dated October 2, 1939, and mature December 1, 1964. They provide for interest at an annual rate, ranging from a minimum of 2% to a maximum of 10%, dependent upon the taxpayer's annual earnings.[1] Interest is payable December 1 of each year. Payment may be deferred, however, by the directors when the condition of the company warrants such action. No dividends are to be paid on the stock while interest due on the notes remains unpaid.

In the event of bankruptcy, receivership, dissolution or liquidation, principal and interest are to become immediately due with interest at 6% from the close of the preceding fiscal year. The directors, however, may subordinate the notes "as to both principal and interest to any other indebtedness of the corporation maturing not later than December 1, 1964." The corporation may retire the notes at par plus accrued interest at any time unless otherwise provided in any subordination agreement. No mortgage to secure any obligation maturing after December 1, 1964, other than a purchase money mortgage, may be made while the notes are outstanding without the consent of the holders of three-fifths in amount of the notes. With the consent of the holders of three-fifths in amount, the corporation may alter any of the terms of the notes; provided that no such change shall extend the maturity date for the principal, alter the rate or method of computing the rate of interest, or effect any existing subordination agreement. The notes are transferable by endorsement, and some $6,800 of them have changed hands, all transfers, however, being within the close family circle.

At meetings of the board of directors on October 10, 1939, and November 27, 1939, shortly after the plan had gone into effect, the "registered notes" were subordi-

[1] "Interest hereon shall be payable annually on December 1 of each year for and on account of the fiscal year of the corporation ended last previous to such December 1, the first such date for the payment of interest being December 1, 1940 at a rate which shall not exceed 10 per cent nor be less than 2 per cent and, subject to these limitations, shall be a rate computed as follows: There shall be taken a sum equal to two-thirds (2/3rds) of the net earnings of the corporation for the fiscal year ended last previous to such December 1, computed in accordance with the regular bookkeeping methods and practices of the corporation as established from time to time in good faith by its directors and officers but without deduction for federal income taxes paid or accrued and without deduction for interest upon these notes, and the rate of interest shall be the rate, figured to the nearest one-quarter per cent (1/4%) which such sums would represent as interest upon an assumed principal sum of Four Hundred Thousand ($400,000) Dollars. Provided, nevertheless, that from and after the close of the fiscal year ended next pre- vious to December 1, 1964, and for such further time as this note shall remain unpaid, interest shall be at the rate of six per cent (6%) per annum, and such interest to December 1, 1964, shall be included in the installment payable at that date.

"The corporation shall have the power, by vote of its Board of Directors, to defer the payment of all or part of any annual installment of interest for such time as the directors may in good faith determine to be necessary by reason of the condition of the corporation, without incurring liability for interest upon such deferred installment of interest, provided that such suspension of payment shall in no wise relieve the corporation of the obligation to pay the amount suspended at some future time and shall in no event operate to defer payment beyond December 1, 1964. The corporation covenants that it will pay no dividends upon any shares of stock of the corporation unless and until all then due interest upon these notes, including interest which may have been postponed as aforesaid, shall have been paid in full."

nated to two loans from one bank of $50,-000 bearing interest at 4% and $30,000 bearing interest at 3%, a loan of $50,000 bearing interest at 4% from a second bank, and a loan of $100,000 bearing interest at 6% from a third creditor.

On November 27, 1940, the taxpayer's treasurer reported to the directors that he had fixed at 10% the rate of interest for the fiscal year ending September 28, 1940, a rate less than that computable with reference to the net earnings under the terms of the notes but being the maximum there provided.

 The question resolves itself into what is the proper characterization of the payments. Are they interest and as such deductible under § 23(b),[2] or are they dividends[3] and as such not deductible? So-called interest, here paid to the stockholders who are also the holders of the "registered notes," may be essentially dividends and not interest if it is regarded as the further distribution of profits. We must also consider the character of the security under which payment is made. Modern corporate practice evidences many departures from the older concepts and forms, and the modern use of many hybrid types of security has been accompanied by an increasingly loose use of terminology in the characterization of the particular security. Conditioned by one set of factors preferred stock may go by the name of bonds and notes, and in other circumstances we may encounter notes and bonds going by the name of preferred stock. Whatever the circumstances the basic question whether the payees are creditors or stockholders, and whether the payments are interest or dividends, turns on the consideration of all the relevant facts. Commissioner of Internal Revenue v. Meridian & Thirteenth Realty Co., 7 Cir., 1942, 132 F.2d 182; Eastern Gas & Fuel Associates v. Commissioner of Internal Revenue, 1 Cir., 1942, 128 F.2d 369; Commissioner of Internal Revenue v. Schmoll Fils Associated, Inc., 2 Cir., 1940, 110 F.2d 611; Commissioner of Internal Revenue v. Proctor Shop, Inc., 9 Cir., 1936, 82 F.2d 792, 794; Mertens, Law of Federal Income Taxation, §§ 9:24 and 26:10.

In the Proctor Shop case, supra, the court observed that "none of the decided cases lay down any comprehensive rule by which the question presented may be decided in all cases, and 'the decision in each case turns upon the facts of that case,' * * * in each case it must be determined whether the real transaction was that of an investment in the corporation or a loan to it. * * * The real intention of the parties is to be sought and in order to establish it evidence aliunde the contract is admissible." The taxpayer in the instant case is a small "family corporation" with fifteen stockholders. The issuance of the notes brought no new capital into the corporation. They represent a mere exchange of stock for notes which did not affect in any material way the previously existing interest of the stockholders. Each retained the same proportionate right to participate in the profits of the business. The subordinable notes bore a variable rate of interest dependent on earnings, and what each stockholder might not get as "interest" he gets as dividends. The stockholders, moreover, retain their same proportionate control of the corporation as owners. The taxpayer admits that tax avoidance was an important factor in this exchange, and the Tax Court found that it was "the only substantial purpose motivating the transaction." The taxpayer contended that there were further advantages, the reduction in equity control which enabled a concentration of control to affect stable management, and the providing of an investment, negotiable and more readily salable than the stock of this closely held corporation. The Tax Court dismissed the first, saying that "each shareholder retained the precise voice in the management which he had prior to the transaction." As for the negotiability feature, the notes could be subordinated to creditor claims and were. They contain restrictive provisions, and the payment of interest may be deferred. The rate of return is indeterminate. The few notes negotiated remained in the family circle, and the Tax Court has questioned their salability. We think that the Tax Court properly found "that what the parties really in-

---

[2] 26 U.S.C.A. Int.Rev.Code, § 23.
 "In computing net income there shall be allowed as deductions: * * *
 "(b) Interest. All interest paid or accrued within the taxable year on indebtedness."
 [3] § 115.
 "(a) Definition of dividend. The term

'dividend' * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year."

tended to create was a security retaining the profit-sharing advantage of stock, leaving intact their voice in the management, but extending a tax advantage to the corporation not possible in stock," and that there was no proper indebtedness. To hold the contrary would be exalting form above substance.

The taxpayer contends that the language quoted from the Proctor Shop case, supra, with respect to "evidence aliunde the contract" has been "misused." He concedes that such use was proper in Arthur R. Jones Syndicate v. Commissioner of Internal Revenue, 7 Cir., 1927, 23 F.2d 833, where a stock device was used to conceal a usurious loan and "dividends" paid on such stock were held deductible interest; and in Wiggin Terminals, Inc., v. United States, 1 Cir., 1929, 36 F.2d 893, where "dividends" paid on preferred stock issued to creditors to hold only until through dividends they had received a 100% bonus on a loan were held deductible interest. We have been referred to no case holding that the court could not look to "the actualities of the situation" in determining whether corporate distributions were in fact true dividends or interest on indebtedness. See Healy concurring in Pacific Southwest Realty Co. v. Commissioner of Internal Revenue, 9 Cir., 1942, 128 F.2d 815, 819.

In Commissioner of Internal Revenue v. H. P. Hood & Sons, Inc., 1944, 141 F.2d 467, 470, this court sustained the Tax Court's determination that cumulative interest payments on 7% income debentures were deductible interest and said: "Although the annual return on the instruments was payable 'only out of and to the extent of the net earnings' that proprietary feature is subordinate to the indebtedness feature calling for payment of all accumulated unpaid interest on the due date 'whether or not the available net earnings of the company are sufficient for such payments.'" In that case the debentures provided for a fixed rate of interest, the annual payment of which only was contingent upon the extent of the net earnings. There the taxpayer bound itself to pay on the maturity date "the face amount of the instrument together with 'all accumulated and/or accrued and unpaid interest' at the designated rate" of 7%. The taxpayer in the present case has not contracted to pay a fixed rate of interest regardless of whether or not its net earnings are sufficient. The payment of interest is deferable as in the Hood case, and in addition to that the

rate itself is a variable rate ranging from 2% to 10% depending upon earnings, and it is determined at the end of the fiscal year. The rate is thus not fixed in advance, and until fixed it is contingent. "Stockholders have no absolute right to dividends until they are declared. A creditor has a right to his interest in any event." Commissioner of Internal Revenue v. Meridian & Thirteen Realty Co., supra [132 F.2d 187]. Here the determination of the rate of interest is geared to the making of profits by the taxpayer, and the noteholder does not know in advance what the rate will be. It cannot be said of him therefore that he has a right to his interest "in any event", since he will not know until the end of the fiscal year what the rate will be, and the fixing of the rate is a condition precedent to the determination of the amount of interest due. In the light of all the facts in the case the provision that minimum and maximum rates have been set is not controlling. The notes authorize the directors to suspend the payment of interest when the needs of the business require such action. No provision is made for interest to be paid on such suspended payments, and they are subjected to the risks of the enterprise. These factors taken in conjunction with the provisions for subordination to the claim of creditors and the straight exchange feature of the transaction leaving the proportionate interests of the stockholders unaffected, move us to conclude on the reasoning of the Hood case, supra, that the indebtedness feature is subordinate to the proprietary feature and to hold that the "interest" on these notes is not "interest * * * on indebtedness" deductible under § 23(b).

The question here presented turns on its special facts. We believe that the Tax Court was correct in holding that the payments made as "interest" were not deductible, and its decision must stand. Dobson v. Commissioner of Internal Revenue, 1944, 320 U.S. 489, 64 S.Ct. 239, rehearing denied 321 U.S. 231, 64 S.Ct. 495.

The decision of the Tax Court of the United States is affirmed.

MAGRUDER, Circuit Judge (dissenting).

I do not regard as decisive the fact that the so-called "interest" to be paid on the "registered notes" is a variable rate contingent upon the amount of the corporation's net earnings. This feature, the government insists, is "the paramount pro-

prietary characteristic" differentiating the equity interest of a shareholder from the debtor-creditor relationship. It has long been settled in the law of partnership that one may lend money to the proprietor of a business upon an agreement for the payment of interest not at a predetermined fixed rate but in a variable amount ascertained by reference to a percentage of the net profits, without thereby becoming a partner in the business and liable as a co-proprietor for the business debts. See Meehan v. Valentine, 1892, 145 U.S. 611, 624, 12 S.Ct. 972, 36 L.Ed. 835. In the case of such a loan, the return paid to the lender under the agreement, though variable in amount from year to year, would surely constitute "interest" within the meaning of section 23(b) of the Internal Revenue Code, since it would be the agreed "compensation for the use or forbearance of money." Deputy v. Du Pont, 1940, 308 U.S. 488, 498, 60 S.Ct. 363, 368, 84 L.Ed. 416.

Of course, the lending of money is not the only way an indebtedness may arise upon which interest is to be paid.

Thus, upon the sale of goods, the buyer may agree to pay interest on the unpaid installments of the purchase price, and it may be provided that this interest shall be variable in amount contingent upon earnings. This would be deductible under section 23(b) quite as much as if the purchase money had been paid over to the seller and then lent back to the buyer.

And so, it is possible for a corporation to create an "indebtedness," within the meaning of section 23(b), by an agreement under which the corporation redeems some of its stock at par, and instead of paying cash therefor gives to the surrendering shareholders interest-bearing notes for the redemption price. The exchange of stock for notes would give rise to an "indebtedness," even though no new capital were thereby brought into the corporation.

The result would be no different if we assume that the main motive for the recapitalization was to achieve a tax advantage. Commissioner of Internal Revenue v. H. P. Hood & Sons, Inc., 1 Cir., 1944, 141 F.2d 467, 471. To test this, suppose that, at the organization of the corporation, the fifteen individuals who were to put up the money had considered the alternatives of having the corporation issue to them 5,000 shares of stock at $100 a share, or 1,000 shares of stock and ordinary interest-bearing notes in an amount of $400,000; and had decided on the latter course in or-

der to give the corporation the advantage of the interest deduction under section 23 (b). This advantage would have been achieved had they chosen the second alternative at the outset. Yet the proportionate voting control of the original shareholders would have been the same either way, and their returns in the aggregate might have been the same either way—under the first alternative received solely as dividends, under the second partly in the form of dividends and partly as interest. If interest deductibility could be achieved by an original capitalization as above supposed, it could equally well be achieved by a subsequent recapitalization along the same lines.

Therefore I think we should lay aside as irrelevant two points stressed in the opinion of the Tax Court: (1) "The factor of tax avoidance loomed large in the minds of the parties by their own admission, and indeed it appears to have been the only substantial purpose motivating the transaction"; and (2) "Each shareholder retained the precise voice in the management which he had prior to the transaction. He retained the same right to participate in the profits of the business; what he did not receive by way of interest he would take by way of dividends on his remaining stock."

Whether the registered notes are to be classified as evidences of indebtedness depends upon an analysis of their substantive provisions, not upon who holds them. It is not suggested that the notes are a sham, that is, that they do not embody the real understanding of the parties to the transaction. If the notes would have been evidences of indebtedness in the hands of outsiders, they are equally so in the hands of the group who also hold the outstanding stock. And if the notes would have been evidences of indebtedness had some of the original shareholders surrendered all their shares of stock in exchange for the notes, they cannot be anything different merely because each of the original shareholders surrendered four-fifths of his shares in exchange for a proportionate part of the notes, thereby leaving unaffected the relative voting control.

From the foregoing I think it is clear that, had the notes in the present case been simple promissory notes in the conventional form, unencumbered by the special provisions which have been set forth in the opinion of the court, the amounts annually paid thereon would have been deductible as "interest * * * on indebtedness."

The special provisions in the notes do

not require a different conclusion. The provision for subordination is no novelty in debtor-creditor agreements. It happens to be the fact that, at the date of the hearing before the Tax Court, all the subordinations had been terminated by the payment of the obligations. In the event of bankruptcy, the holders of the notes would have provable claims pari passu with the other general creditors. As already indicated, the provision for a variable rate of interest, from a minimum of 2% to a maximum of 10%, depending on earnings, is wholly consistent with the existence of an indebtedness, and indeed provisions of that general type are not uncommon in debt-creating instruments. See Meehan v. Valentine, 1892, 145 U.S. 611, 12 S.Ct. 972, 36 L.Ed. 835; Edwards v. Bay State Gas Co., C.C.D.Del.1898, 91 F. 946. The minimum of 2% is not contingent upon earnings, and payment of this 2% by the corporation would certainly not be in violation of provisions in the various corporation laws against payment of dividends out of anything but earnings or surplus. True, the corporation under certain conditions may defer the payment of the stipulated interest, not, however, beyond the maturity date of the principal. This, again, is a proper matter of agreement between debtor and creditor.

In other words, the notes are characteristic evidences of indebtedness, in that (1) they contain an unqualified obligation to make a fixed principal payment on a day certain (which may be accelerated under certain conditions, but not postponed); [1] (2) they carry no voting power or voice in management of the obligor's business; [2] and (3), at least outside the field of taxation, the notes would be given effect according to their terms, and the holders of the notes would have the recognized status of creditors.

Of course, Congress might restrict the deduction for interest to cases where interest is payable at a fixed rate irrespective of earnings. This is exclusively a matter of legislative policy. So far, no such restriction has been put into the Act. The courts are bound by the unqualified statutory command in § 23(b) that deduction shall be allowed for "*all interest* paid or accrued within the taxable year on indebtedness" [italics added]—with one exception not now relevant.

In the case at bar, there is no disputed question of fact relevant to the issue to be decided. The terms of the notes speak for themselves, and their legal effect, that is, whether they constitute evidences of "indebtedness" within the meaning of section 23(b), is a question of law. This is not even the kind of legal question with which the Tax Court may be assumed to have specialized familiarity, for the legal effect of the instruments as constituting an indebtedness may arise in many ways outside the tax field, and there is no indication that Congress meant the word "indebtedness" to have any peculiar meaning in section 23(b). Congress has given the Circuit Courts of Appeals authority to modify or reverse decisions of the Tax Court if "not in accordance with law" (44 Stat. 110). The reports of the Senate and House committees state pretty clearly what Congress meant by that; one of the "questions of law" which the reports say courts may consider on review is "the proper interpretation and application of the statute or any regulation having the force of law." H.R. Rep. No. 1, 69th Cong., 1st Sess. (1925), p. 19; Sen. Rep. No. 52, 69th Cong., 1st Sess. (1926), pp. 36–37. Prior to Dobson v. Commissioner, 1943, 320 U.S. 489, 64 S.Ct. 239, the Circuit Courts of Appeals would certainly have been considered free to make an independent review of issues such as that in the present case. Helvering v. American Dental Co., 1943, 318 U.S. 322, 63 S.Ct. 577, 87 L.Ed. 785; Powers v. Commissioner of Internal Revenue, 1941, 312 U.S. 259, 61 S.Ct. 509, 85 L.Ed. 817. I think the reviewing courts should continue to assume that this is so, until the Supreme Court explicitly tells us otherwise. The Dobson opinion, to my reading, contains no such explicit direction. Cf. Security Flour Mills Co. v. Commissioner of Internal Revenue, 321 U.S. 281, 64 S.Ct. 596; Norton v. Warner Co., 1944, 321 U.S. 565, 569, 64 S.Ct. 747.

Such being my view, with all deference I dissent from the opinion and judgment of the court.

---

[1] To further assure the fulfillment of this obligation, the notes provide that no corporate mortgage shall be made to secure an obligation maturing later than the due date of the notes, and that no subordination agreement shall extend beyond such due date.

[2] If the original shareholders should transfer their remaining shares of stock, they would cease to have any voting power in the corporation, though they still held on to the notes.