EMANUEL N. (MANNY) KOLKEY, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 44520, 44818, 44850, 45063, 45064. Filed October 18, 1956.

*Morton J. Harris, Esq.*,* for the petitioners in Docket Nos. 44520 and 44850.

*Samuel E. Hirsch, Esq.*, for the petitioners in Docket Nos. 44818, 45063, and 45064.

*George T. Donoghue, Esq., John E. Owens, Esq.*, and *Geoffrey J. Lanning, Esq.*, for the respondent.

---

[1] The following cases are here consolidated: Pauline Kolkey, Docket No. 44520; Kyron Foundation, Inc., Docket No. 44818; Emanuel N. (Manny) Kolkey, Docket No. 44850; Barnet Perel and Bertha Perel, Docket No. 45063; Maurice L. Cowen and Rosalie Cowen, Docket No. 45064.

*Withdrew as counsel.

38

44

OPINION.

PIERCE, *Judge:*

## I.

The basic question underlying the cases of all the petitioners here involved is: Did the $4,000,000 of the corporate notes which the Kyron corporation, immediately after it was organized with $1,000 capital stock, issued to Cowen and his associates in exchange for all the stock of the operating Continental corporation, represent a bona fide debtor-creditor relationship resulting from the "purchase and sale" of this stock? Or did such notes, in reality and irrespective of their form, represent equity capital investments of Cowen and his associates in the continued business?

In the cases of the individual petitioners, which we shall consider first, these petitioners contend that, in the transactions of March 14, 1949, Cowen and his associates "sold" to Kyron all of their interests in the stock and going business of Continental, for said $4,000,000 corporate notes; that thereafter the only relationship of these individuals to Kyron and its business was that of "creditors," "pledgees" of all the Kyron stock, and employed "managers"; that when Kyron thereupon took over the net assets of Continental in liquidation and paid Cowen and his associates $400,000 out of the assets so acquired, this sum was received by the latter solely in the capacity of "creditors," and as part payment for their "sale" of the Continental stock; and that, accordingly, this sum is entitled to capital gains treatment for income tax purposes. The respondent, on the other hand, contends that the transfer of the Continental stock to Kyron was not in truth and reality a "sale," but rather a contribution of equity capital to the reorganized business; that Cowen and his associates were not thereafter bona fide "creditors," but actually equity capital investors who had arbitrarily cast the evidences of their investments in the form of "notes"; and that the $400,000 which they received in the transactions of March 14, 1949, constituted a taxable dividend to them, as such equity capital investors. Our analysis of the facts and the applicable authorities impels us to agree with the conclusions of the respondent.

It is true that the form of the notes, and also the manner in which the transactions of March 14, 1949, were reflected on the Kyron books, would, standing by themselves, tend to indicate that the Continental stock had been "sold," and that the notes were evidences of corporate debt. But in determining the effect of transactions for Federal income tax purposes, form, though of some evidentiary value, is not con-

clusive. *Gregory* v. *Helvering*, 293 U. S. 465. The same is true of bookkeeping entries. *Doyle* v. *Mitchell Brothers Co.*, 247 U. S. 179. The important consideration is not the formalities, however meticulously observed, in which the parties cast their transactions, but rather the substance of such transactions and the true nature of the relationship created thereby. *Griffiths* v. *Helvering*, 308 U. S. 355; *1432 Broadway Corporation*, 4 T. C. 1158, affirmed per curiam, 160 F. 2d 885 (C. A. 2). The Supreme Court said in the *Griffiths* case, *supra:*

We cannot too often reiterate that "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed— the actual benefit for which the tax is paid." *Corliss* v. *Bowers*, 281 U. S. 376, 378, 50 S. Ct. 336, 74 L. Ed. 916. And it makes no difference that such "command" may be exercised through specific retention of legal title or the creation of a new equitable but controlled interest, or the maintenance of effective benefit through the interposition of a subservient agency. * * *

The essential difference between a "stockholder" and a "creditor" was pointed out by the Court of Appeals for the Sixth Circuit in *United States* v. *Title Guaranty & Trust Co.*, 133 F. 2d 990, 993, as follows:

*The essential difference between a stockholder and a creditor is that the stockholder's intention is to embark upon the corporate adventure, taking the risks of loss attendant upon it, so that he may enjoy the chances of profit.* The creditor, on the other hand, does not intend to take such risks so far as they may be avoided, but merely to lend his capital to others who do intend to take them. * * * [Italics in original.]

To substantially the same effect, see *Wilshire & West. Sandwiches* v. *Commissioner*, 175 F. 2d 718, 721 (C. A. 9); *Commissioner* v. *Meridian & Thirteenth R. Co.*, 132 F. 2d 182, 186 (C. A. 7); *Commissioner* v. *O. P. P. Holding Corp.*, 76 F. 2d 11, 12 (C. A. 2).

In *McGuire* v. *Commissioner*, 84 F. 2d 431, affirming 32 B. T. A. 1075, the Court of Appeals for the Seventh Circuit said at page 432:

Neither artifice, subterfuge, or bad faith need be present to bring a transaction within the meaning of the statute here involved, for as we read the law a taxpayer may well act with the utmost good purpose and without evil intent and yet his transactions may in effect be the equivalent of the distribution of a taxable dividend.

The problem of determining the true nature of advances to business enterprises has arisen frequently in cases involving a so-called thin corporation, wherein the major portion of the cash and property required to get the business established and under way has been evidenced by corporate notes. See for example: *R. M. Gunn*, 25 T. C. 424, on appeal C. A. 10; *Estate of Herbert B. Miller*, 24 T. C. 923, on appeal C. A. 9; *Colony, Inc.*, 26 T. C. 30, on appeal C. A. 6; *Erard A. Matthiessen*, 16 T. C. 781, affd. 194 F. 2d 569 (C. A. 2), *Isidore Dobkin*, 15 T. C. 31, affirmed per curiam, 192 F. 2d 392 (C. A. 2); *Swoby Corporation*, 9 T. C. 887.

None of the decided cases dealing with thin corporations lay down a comprehensive "rule of thumb," by which the true nature of advances made to a new enterprise may be determined in all situations. But such cases have pointed out or suggested various tests or criteria which may be applied in seeking out the realities, among which are the following: Was the capital and credit structure of the new corporation realistic? What was the business purpose, if any, of organizing the new corporation? Were the noteholders the actual promoters and entrepreneurs of the new adventure? Did the noteholders bear the principal risks of loss attendant upon the adventure? Were payments of "principal and interest" on the notes subordinated to dividends and to the claims of creditors? Did the noteholders have substantial control over the business operations; and if so, was such control reserved to them as an integral part of the plan under which the notes were issued? Was the "price" of the properties, for which the notes were issued, disproportionate to the fair market value of such properties? Did the noteholders, when default of the notes occurred, attempt to enforce the obligations?

Application of such tests requires a consideration and weighing of all the relevent facts and circumstances of the particular case. Precedents provide no ready answer, for the question is factual and no single factor may be said to be controlling. *Talbot Mills*, 3 T. C. 95, 99, affd. 146 F. 2d 809 (C. A. 1), affd. 326 U. S. 521; *Commissioner* v. *Meridian & Thirteenth R. Co., supra; Proctor Shop, Inc.*, 30 B. T. A. 721, 725, affd. 82 F. 2d 792 (C. A. 9). As was said by the Court of Appeals for the Sixth Circuit in *Gooding Amusement Co.* v. *Commissioner*, 236 F. 2d 159 (C. A. 6), affirming 23 T. C. 408, wherein the issue was the reality of a purported debtor-creditor relationship:

most of the authorities are of little value in the determination of a particular case, for the reason that "each depends for its solution upon its own peculiar facts," to be determined in the light of all the surrounding circumstances. * * *

In the instant case, the capital structure of Kyron was patently unrealistic, and grossly inadequate for carrying on the business which it was organized to take over. The gross assets per books of the corporation which it was to succeed were approximately $1,288,000; the expenditures of that corporation for advertising alone, during the prior 19-month period, totaled $1,366,437.42; and the prearranged "price" which Kyron was to pay for such business was $4,000,000. Yet, the only amount which Survey contributed to Kyron for all the authorized capital stock was $1,000. This was the minimum for which a Delaware corporation could be organized (8 Del. C., sec. 102 (4)); and it was not even sufficient to cover the $25,000 costs of organization, which Kyron paid on the same day out of the assets taken over from Continental. The situation was practically the same as if Cowen and his associates had purported to "sell" their business for $4,000,000

to a penniless individual. Moreover, there is no indication that Kyron had any source, other than an equity capital investor, from which it could have obtained a $4,000,000 advance of cash and property for its business purposes. Survey was in straitened circumstances; and it had insisted upon the organization of a separate corporate entity, so that the risk of loss to it, and to its members, would be limited to the $1,000. Likewise, the officers of Kyron inserted a provision in the notes that no present or future officer, director, incorporator, or stockholder would be personally liable thereon. Even after Kyron had taken over the assets of the predecessor corporation, it was necessary for it to pledge all the accounts receivable and to pay interest at the rate of one-thirtieth of 1 per cent per day, or approximately 12 per cent per annum, in order to procure a loan of $350,000. All these facts indicate that the real intention of Cowen and his associates was to provide substantially everything which Kyron required to commence business and to remain in business—at the risk of the enterprise and as the predominant part of the true capital structure.

The business purpose and operating facilities of Kyron were identical with those of the corporation which Cowen and his associates had theretofore been operating as stockholders and officers. No new capital was added, other than the $1,000 which, as we have pointed out, was less than the costs of organization. No new customer was obtained; no competitor was eliminated; no new product or operation was made available; no new management was brought in; no new plant or other physical properties were acquired; and there was no change which could reasonably be expected to increase earnings. The logical conclusion is that the purpose of Cowen and his associates, in transferring their operating business to Kyron, was twofold: (1) To formulate a purported "sale" under which they could masquerade as "creditors," and withdraw earned surplus and profits in the guise of capital gains; and (2) to create a pretext for tax exemption, which they hoped would increase the amount of distributable profits by more than the dividends to Survey, and also decrease their risk of loss in the adventure.

The installment notes provided, *inter alia*, that payments of "principal" and "interest" thereon would not be in default, if they could not be paid out of net earnings, after prior provision for minimum dividends to Survey in the amounts of $75,000 in the first fiscal year and $100,000 in each subsequent fiscal year. These terms, in themselves, are characteristics of a subordinated class of "stock."

As regards control over the business operations, Cowen and his associates had substantially the same duties and responsibilities as "managers" of Kyron that they previously had as "officers" of Continental; and this same control continued after Survey had sold its stock and withdrawn from the business. Cowen and Perel were the princi-

pal operators. Petitioner Kolkey, who had a 55 per cent interest both in the predecessor corporation and in the installment notes received therefor, stated in an affidavit which he identified at the trial: "They [Cowen and Perel] ran the company as they saw fit and Mr. Ruskin [the elected president of Kyron] always abided by their decisions by long distance phone calls to New York."

The $4,000,000 "price" for the Continental stock was, in our opinion, grossly excessive; we have hereinbefore found, as a fact, that the fair market value of this stock at the time of its transfer to Kyron was not more than $1,100,000. In determining such value, we have taken into consideration the fact that the stock was unlisted, and had no established market; the character of the assets, the net worth, and the ratio of current assets to current liabilities; the earnings and dividend payments; the period for which the corporation had operated; the nature and reputation of its product; the absence of patents, and of manufacturing and research facilities; the lack of diversification in products; the characteristics and risks of the industry of which it was a part; the management; the operating costs, including the expenses for advertising and sales promotion; the expert testimony presented at the trial; and all other relevant factors having a bearing on the value of the stock. As a check on the reasonableness of our valuation, we have not overlooked that, within 1 year after the Continental business was taken over by Kyron, Survey sold all of its shares of stock in said company for $5,000; and that, in December 1950, after Survey had withdrawn and Cowen and his associates held all the equity in the business, Kolkey sold one of the $1,800,000 installment notes to Cowen and Perel for $35,000. Inflation of the "sale price" served to extend the period during which Cowen and his associates could participate as purported "creditors"; increased the amount which they could withdraw as "principal," if the enterprise were successful; and also increased the possibilities for recapture of the properties, under the stringent default provisions of the notes.

Furthermore, although no payment of "interest" was made on the installment notes after November 1, 1949, and no payment of "principal" thereon was ever made, Cowen and his associates at no time made any attempt to enforce or collect these notes, either by foreclosure of the "collateral" or otherwise. They had complete power, under the terms of the notes, to transfer the stock into their own names and to accept the resignations of officers which had been lodged with them, but they took no such action, even down to the time of the trial. This tends to show that they were not bona fide creditors; that they regarded the provisions for foreclosure of "collateral" to be mere formalities; and that their intention was that their advances should remain indefinitely at the risk of the going business, as a part of the permanent capital structure.

It is our opinion that Cowen and his associates did not "sell" their Continental stock to Kyron, but contributed it as equity capital; that they were not bona fide creditors, but equity capital investors; and that the $400,000 which they received from Kyron constituted taxable dividends to them, within section 115 (a) of the Internal Revenue Code of 1939, to the extent of the available earnings and profits.

As to the extent of such earnings and profits, we hold that, when Kyron as sole stockholder of Continental took over all of the net assets of that corporation in complete liquidation, no gain or loss was recognizable, as provided in section 112 (b) (6) of the 1939 Code. Accordingly, the undistributed "earnings and profits" of Continental remained, for purposes of distribution, "earnings and profits" of Kyron. *Commissioner* v. *Sansome*, 60 F. 2d 931 (C. A. 2), certiorari denied 287 U. S. 667; *Putnam* v. *United States*, 149 F. 2d 721 (C. A. 1). The amount of Continental's earnings and profits at the time of its liquidation exceeded $400,000; and therefore the $400,000 distribution by Kyron is includible in the gross incomes of Kolkey, Cowen, and Perel as dividends of the taxable year involved, in the proportions in which they received the same, to wit: 55 per cent to Kolkey, 22½ per cent to Cowen, and 22½ per cent to Perel.

By reason of our above holdings, it is unnecessary to consider the alternative contention of respondent, that said $400,000 payment constituted a taxable dividend under section 112 (c) (2) of the 1939 Code.

*II.*

The next question is whether the petitioner Kyron is exempt from income tax for each of its fiscal years here involved, under section 101 (6) of the 1939 Code.[5] It is our opinion that this question must be answered in the negatitve.

Here we have a corporation which was organized to carry on, and did carry on during each of the fiscal periods involved, a commercial business that did not include any direct charitable activity. Thus, any possible claim for its exemption under the above statute must be based on the theory that it was organized and operated during said periods exclusively for the benefit of Survey or some other tax-exempt charity; and that no part of its net earnings for either of such periods inured to the benefit of any private shareholder or individual.

---

[5] SEC. 101.  EXEMPTIONS FROM TAX ON CORPORATIONS.

The following organizations shall be exempt from taxation under this chapter—

  *       *       *       *       *       *       *

(6) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation.

We have hereinbefore found and held that the true relationship of Cowen and his associates to Kyron was not that of bona fide creditors; but that they actually were equity capital investors. Our conclusion, from analysis of all the facts, is that the dominant purpose for the organization and operation of Kyron was not to aid charity, but rather to provide for the inurement to said individuals, as equity capital investors, of most of the net income of the enterprise.

During Kyron's first fiscal period, Cowen and his associates actually received $400,000 on March 14, 1949, as a purported payment of "principal" on the notes; $27,000 on July 1, 1949, as a purported payment of "interest"; and $30,000 on November 1, 1949, as another purported payment of "interest." Also during this first fiscal period, Kyron permitted a corporation, owned by Cowen and Perel, to have the benefit of advances from its funds in the amount of $1,422.50, and actually increased such advances during the period to $1,700.92. During its second fiscal period, it made other advances of its funds, in the amount of $7,000, to four corporations controlled by Cowen and Perel. During its first fiscal period, it paid $1,000 for wages of a chauffeur and a cook, who were employed by Cowen as his personal household servants; and during its second fiscal period, it expended $3,200 for the same purpose. In the second period, it placed first and second mortgages on its office building; and delivered the $125,000 proceeds therefrom to Cowen and his associates in prepayment of 10-year promissory notes, on which the first installment had not become due. Also during the second period, it permitted Cowen and his associates to increase to $37,500 their respective salaries as "managers," which had previously been fixed under the management contract at $25,000; and it did this without approval of any authorized board of directors. All such actions inured to the benefit of private individuals.

On February 23, 1950, before the first fiscal period had ended and before the net earnings of such period had become determinable, Survey sold all its stock in Kyron for $5,000, which was paid by Cowen and Perel out of their own funds. Such sale cut off the possibility of inurement to Survey of any net earnings of Kyron, in excess of the $43,750 dividends which it had received. This was far from "all" the net profits of Kyron for its first fiscal period, which were $199,611 before taxes and $123,759 after taxes.

At the time Survey sold its stock, on February 23, 1950, the attorney for Cowen and Perel caused it to sign and deliver to him an "Assignment Separate from Certificate" for all the shares, in which the assignee was designated as "S. Harvey Klein, as Trustee for a charitable, religious and educational Trust." The shares were never trans-

ferred to such trustee; and subsequently said attorney told Kyron's president that Klein was not acting as trustee, and did not intend to so act.

Later, in the summer of 1950, the attorney for Cowen and Perel caused Survey to sign a second "Assignment" for the stock, in which the assignee was designated as "Thomas D. O'Bryan, as Successor Trustee for a Charitable, Religious and Educational Trust." O'Bryan, however, did not purport to declare himself a trustee until August 1950; and in the "Declaration of Trust" which he then signed, he did not purport to qualify as a successor trustee for any existing trust. Rather, said declaration recited that a certain "donor" (who actually was Cowen and Perel) had "purchased" all of the Kyron shares, and wished "to create a trust." Almost half of Kyron's taxable year had then expired. Also, we have hereinbefore found, as facts, that neither the assignment nor the certificate for the stock was ever delivered to O'Bryan; that he never held any trust corpus or received any trust income; that he never kept any trust accounts or made any returns as trustee; and that he never became a stockholder of Kyron. It follows that, at all times after Survey sold its stock on February 23, 1950, the entire net earnings of Kyron inured to the benefit of Cowen and his associates; as private shareholders or individuals.

We hold that the petitioner Kyron was not exempt from income tax under section 101 (6) of the 1939 Code for either of its taxable years here involved. It is unnecessary for us to consider the further question, on which there have been conflicting decisions, as to whether Kyron could qualify for the exemption in any event, by reason of the fact that it conducted a commercial enterprise and did not directly engage in any charitable activity.

### III.

There remains the question of whether Kyron is entitled to certain deductions, and whether it is liable for additions to tax under section 291 (a) of the 1939 Code.

Kyron contends that it is entitled to a deduction of $86,949.67, in its first taxable period, for "interest" accrued on the $3,600,000 installment notes held by Cowen and his associates; and a deduction of $90,000, in its second fiscal period, for "interest" accrued on said notes. We have hereinbefore held that said notes did not constitute "indebtedness" of Kyron; and, accordingly, the corporation is not entitled to any deduction for interest paid or accrued thereon. Cf. *R. M. Gunn, supra.* It is unnecessary to consider respondent's further contention that the deductions are not allowable, in any event, by reason of the provisions of section 24 (c) of the 1939 Code.

Kyron further contends that it is entitled to a deduction of $3,603.50 in its second fiscal period for interest accrued on its liability for income tax for its first fiscal period. However, Kyron did not report any tax to be due on its income tax return for the first period; it has not conceded liability for such tax; and the existence of such liability is one of the issues here in dispute. Neither a tax nor interest thereon is accruable while the liability therefor is in dispute. Cf. *Dixie Pine Products Co.* v. *Commissioner*, 320 U. S. 516. We hold that the claimed deduction is not allowable.

The respondent determined that Kyron is liable, under section 291 (a) of the 1939 Code, for an addition to the tax for each of the periods involved, by reason of failure to file its returns within the time prescribed for such filing. Section 291 (a) provides, in substance, that the addition to tax shall be imposed for failure to make and file a timely return, "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." We have hereinabove found, as a fact, based upon evidence as to the reasons for the delays, that Kyron's failure to file timely returns, for the two periods here involved, was due to reasonable cause and not due to willful neglect. Accordingly, we hold that no addition to the tax, under section 291 (a), should be imposed for either of such periods.

*Decisions will be entered under Rule 50.*