To reflect the foregoing,

*Decision will be entered for the respondent.*

C-LEC PLASTICS, INC., PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 11811–78.      Filed April 15, 1981.

*John O. Sitzler,* for the petitioner.
*Kenneth J. Rubin,* for the respondent.

DRENNEN, *Judge*: In the statutory notice of deficiency, respondent determined a deficiency in tax in the amount of $14,717.25 for petitioner's taxable year ended May 31, 1974. The only issue for our decision is, for purposes of section 165(a), I.R.C. 1954,[1] to determine petitioner's adjusted basis in certain plastic molds and rings which were destroyed by fire.

FINDINGS OF FACT

Some of the facts were stipulated and they are so found. The stipulation of facts together with the exhibits attached thereto are incorporated herein by this reference.

Petitioner C-Lec Plastics, Inc. (hereinafter petitioner), is a corporation duly incorporated under the laws of the State of New Jersey, and it had its principal place of business in Edgewater Park, N.J., when it filed its petition herein. Petitioner timely filed its corporation income tax return for the taxable year ended May 31, 1974, with the Internal Revenue Service, Holtsville, N.Y.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the taxable years in issue.

Edward D. Walsh (hereinafter Walsh) was the president and sole shareholder of petitioner at all times relevant herein.

Prior to May 31, 1970, petitioner, through the individual efforts of Walsh, created certain property which was used or sold to perform a contract with Physics International. The property consisted of 1 pattern mold, 3 master molds, 50 molds, 48 lite rings, and 1 plastic ring. (Hereinafter, this property will be referred to collectively as the molds.) The cost involved in creating the molds was deducted on petitioner's income tax return for its taxable year ended May 31, 1970.

On or about February 29, 1972, petitioner terminated the lease of its business premises and abandoned the molds along with various other properties. On or about the same date, Walsh took possession and acquired ownership of the abandoned molds. Walsh's basis in the molds for Federal income tax purposes and for purposes of this proceeding was at all times zero.

As of May 31, 1973, petitioner's bank account was overdrawn and it was in a cash-poor financial position. As of that date, petitioner's books and records showed that it owed $53,785.16 to Walsh. This amount was reflected in petitioner's liability account for loans payable to Walsh (hereinafter loan account) and in other accounts. Petitioner also owed amounts to other members of Walsh's family. Petitioner's common stock held by Walsh totaled $5,000.

In early 1973, events occurred which indicated that a new market could emerge for products made with the molds and, thus, it became advantageous for petitioner to reacquire the molds.

On June 1, 1973, a special meeting of petitioner's board of directors was held. The corporate minutes of that meeting provide in pertinent part:

[Walsh] stated that current negotiations were in progress to manufacture lite rings per the Physics International contract specifications. Part of the negotiations were centering around delivery times and use of the molds and rings salvaged by Edward Walsh and not property of the Corporation. It was further stated that re-purchase of the molds and rings would materially help in negotiations and it was formally proposed that the Corporation re-purchase the molds and rings at the offered amount as follows:

| | |
|---|---:|
| 1 Pattern mold | $3,200.00 |
| 3 Master molds @ $1,030 | 3,090.00 |
| 50 Molds @ $411.22 | 20,561.00 |

| 48 | Lite rings @ $117.98 | [2] 5,662.77 |
| 1 | Plastic ring | 4,504.00 |
| | | 37,017.77 |

The Corporation in exchange for the molds and rings would issue common stock at the rate of $80.00 per share. If this proposal is accepted, Edward Walsh will purchase additional common stock to round the issuance to 500 shares and permit the Corporation to reduce the officers' loan account liability by $2,982.23.

The foregoing proposal was unanimously adopted by the board of directors, and petitioner's secretary was instructed to issue the necessary stock certificate.

On or about June 1, 1973, Walsh reconveyed possession and ownership of the molds. At the same time, petitioner issued an additional 500 shares of common stock to Walsh. Additionally, a net reduction of $2,982.23 was made in the loan account. Walsh did not receive any cash or monetary consideration, nor any note or evidence of indebtedness from petitioner at the time he reconveyed the molds to petitioner; nor did petitioner pay Walsh any interest.

By journal entry in petitioner's books dated December 31, 1973, petitioner's acquisition of the molds was recorded by: (1) A debit of $37,017.77 in the research and development account; (2) a debit of $2,982.23 in the loan account; and (3) a credit of $40,000 in the common stock issued account. Under this entry was written:

To record issue of Stock Cert. # [blank in original] dated 6/1/73 for 500 shares @ $80.00 per sh for purchase of 1 Pattern Mold ($3200.00) 3 Master Molds @ $1030.00 ($3,090.00), 50 Molds @ $411.22 ($20,561.00) 48 lite rings @ $117.98 ($5,662.77), 1 Plastic Ring ($4,504.00) [:] total $37,017.77, balance of value charged to loan account.

Consistent with the foregoing, the ledger record of the loan account shows a debit of $2,982.23 on December 31, 1973.

The molds were destroyed by fire on December 1, 1973. On its return for the taxable year ended May 31, 1974, petitioner claimed the following casualty loss deduction as a result thereof:

| 1 | Pattern mold | $3,200.00 |
| 3 | Master molds | 3,090.00 |

---

[2]We realize that 48 rings at $117.98 per ring would total $5,663.04. Nonetheless, because the parties use the $5,662.77 figure and the resulting $37,017.77 total throughout, we will use the same since the arithmetical error is unimportant for purposes of the issue presented.

| | | |
|---|---|---|
| 50 | Molds | $20,561.00 |
| 48 | Lite rings | 5,662.77 |
| 1 | Plastic ring | 4,504.00 |
| | | 37,017.77 |

In the statutory notice of deficiency, respondent determined that petitioner had an adjusted basis of zero in the molds and, thus, was not entitled to any casualty loss deduction for the molds.

Walsh did not report any income arising out of his reconveyance of the molds to petitioner on his individual income tax returns for 1973, or any subsequent year.

## OPINION

Section 165(a) allows a deduction for any loss sustained during the taxable year which is not compensated for by insurance or otherwise. There is no dispute that the molds were destroyed by fire, that no compensation was received or receivable therefor, and that any loss thereon is properly deductible under section 165(a). The only issue to be decided is the amount of that loss. Section 165(b) provides that the amount of the deductible loss is measured by the taxpayer's adjusted basis in the property as provided for in section 1011. See also sec. 1.165–7(b), Income Tax Regs. Thus, a determination of petitioner's adjusted basis in the molds is required.

Subject to certain exceptions, sections 1011 and 1012[3] provide the general rule that a taxpayer's basis in property shall be its cost. One such exception is set forth in section 362(a) (which is included in subch. C):

---

[3]Sec. 1011(a) provides:

(a) GENERAL RULE.—The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis (determined under section 1012 or other applicable sections of this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses)), adjusted as provided in section 1016.

Sec. 1012 provides:

The basis of property shall be the cost of such property, except as otherwise provided in this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses). The cost of real property shall not include any amount in respect of real property taxes which are treated under section 164(d) as imposed on the taxpayer.

(a) PROPERTY ACQUIRED BY ISSUANCE OF STOCK OR AS PAID-IN SURPLUS.—If property was acquired on or after June 22, 1954, by a corporation—

    (1) in connection with a transaction to which section 351 (relating to transfer of property to corporation controlled by transferor) applies, or

    (2) as paid-in surplus or as a contribution to capital,

then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer.

Section 351(a) provides in pertinent part:

(a) GENERAL RULE.—No gain or loss shall be recognized if property is transferred to a corporation * * * by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation.

Petitioner argues that the general rule of sections 1011 and 1012 applies, resulting in an adjusted basis of $37,017.77 in the molds, because petitioner did not exchange its common stock for the molds but rather purchased the molds in an arm's-length transaction.

Based on the testimony of its only witness, Robert E. Williams (hereinafter Williams), petitioner's accountant, petitioner contends that on or about June 1, 1973, there were two separate transactions which were entered into for separate and different reasons. One transaction involved petitioner's issuance of $40,000 in common stock to Walsh in consideration for a like-amount debit to the loan account. This was done, petitioner contends, to improve its capital structure and preclude any allegation that it was thinly capitalized.

The second transaction was the purchase of the molds for the cash equivalent of a $37,017.77 credit to the loan account, which amount was in fact paid to Walsh by the conclusion of petitioner's taxable year ended May 31, 1976, at which time the loan account was zero. This purchase, petitioner contends, brings into operation the general rule of sections 1011 and 1012.

Petitioner explains the seemingly inconsistent December 31, 1973, journal entry concerning the acquisition of the molds, as an example of the "common practice" in recordkeeping, whereby the two transactions were "compounded" in one book entry and only the "net effect" thereof was shown. Similarly, petitioner explains the seemingly inconsistent corporate minutes of the special board of directors' meeting as the work of an unsophisticated corporate secretary who also only recorded the "net effect" of the two transactions.

In opposition to petitioner's contentions, respondent argues that the corporate minutes and books and records indicate that the only transaction was an exchange of the common stock for the molds and an incidental amount of cash (in the form of a debit to the loan account) and that such a transaction falls within the purview of section 351. Accordingly, since Walsh recognized no gain on the transfer, petitioner took Walsh's zero basis in the molds pursuant to section 362(a).[4]

It has long been a principle of Federal income tax law that a transaction's substance rather than its form controls. See, e.g., *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945); *Minnesota Tea Co. v. Helvering*, 302 U.S. 609 (1938); *Gregory v. Helvering*, 293 U.S. 465 (1935).

As noted in *Kolkey v. Commissioner*, 27 T.C. 37, 57–58 (1956):

in determining the effect of transactions for Federal income tax purposes, form, though of some evidentiary value, is not conclusive. * * * The same is true of bookkeeping entries. * * * The important consideration is not the formalities, however meticulously observed, in which the parties cast their transactions, but rather the substance of such transactions and the true nature of the relationship created thereby. [Citations omitted.]

For purposes of section 351 and the inquiry into whether a particular transaction is a sale or exchange, consideration of all the facts is required. *Nye v. Commissioner*, 50 T.C. 203, 211 (1968).

Williams testified that Walsh approached him seeking advice as to effecting petitioner's acquisition of the molds from Walsh. Petitioner's cash-poor financial position precluded an outright cash purchase. Given petitioner's then-existing debt to Walsh in the amount of $53,785.16, Williams also considered it inadvisable for petitioner to purchase the molds solely on credit by increasing the amount it owed to Walsh. Williams testified that he accordingly recommended that petitioner issue $40,000 of common stock to Walsh in exchange for a $40,000 reduction in the

---

[4]Respondent does not argue that petitioner's abandonment of the molds and Walsh's acquisition thereof should somehow be considered together with petitioner's reacquisition of the molds. The only conclusion which can be discerned from the evidence presented is that a bona fide decision was made to abandon the molds and that this decision was in no way connected with, or in anticipation of, the business circumstances which made it advantageous for petitioner to reacquire the molds. Accordingly, we have attached no significance to the fact that petitioner originally owned the molds.

loan account and that the petitioner then "purchase" the molds for $37,017.77 by increasing the loan account in an equal amount.

The only possible conclusion that can be drawn from Williams' testimony is that the two transactions were not separable but were two steps of an integrated whole. The impetus for both transactions was the need for petitioner to acquire the molds and there is nothing to suggest that one transaction would have been effected without the other. In substance, petitioner acquired the molds, and reduced its loan account in the amount of $2,982.23, and Walsh received an additional $40,000 in common stock.[5] Despite the accountant's explanation of his "compounded" book entries, the book entries reflect precisely the action taken by the board of directors as reflected in the minutes of their meeting on June 1, 1973. Under these circumstances, to view the acquisition of the molds as a purchase for cash would be to ignore the best evidence of what was actually intended and what took place.[6] That the transaction was "arm's length" in the sense that $37,017.77 may have been a reasonable price for the molds does not alter the basic substance of the transaction as an exchange of common stock for the molds. Moreover, it is of no import that petitioner did not intend for the transaction to qualify under section 351; that provision applies regardless of petitioner's intent. *Nye v. Commissioner, supra* at 209.

In this case, the evidence shows that both the substance and the form of the transaction support our conclusion that the molds were exchanged solely for petitioner's common stock and that the transaction falls within the purview of section 351.[7] Thus, section 362 would apply and petitioner's adjusted basis in the molds would be the same as Walsh's, increased by any gain recognized by Walsh.

Furthermore, we do not believe it is necessary in resolving the

---

[5]Walsh's "purchase" of an additional amount of stock by means of a debit to the loans payable account does not alter the basic fact that only stock was received for the molds.

[6]Walsh did not testify but it was stipulated that he did not report any gain on the transaction on his personal returns. Since it is also stipulated that he had a zero basis in the molds, this appears to be inconsistent with the position taken by petitioner in this case. Since Walsh was, in effect, the principal on both sides of the transaction, his failure to explain this inconsistency suggests that his testimony would have been unfavorable to petitioner. *Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947); *Blum v. Commissioner*, 59 T.C. 436 (1972).

[7]Other than its argument that a sale occurred rather than an exchange, petitioner makes no argument that sec. 351 does not apply.

issue presented to determine whether there were two transactions or one. Even if there were two transactions, it is clear that they were integrated components of a single whole, the substance of which was that petitioner acquired the molds and Walsh only received common stock.

Although we need not consider it, we note petitioner's argument, raised initially on reply brief, that even if sections 351 and 362 apply to the transaction, petitioner still had an adjusted basis of $37,017.77 in the molds since Walsh had a recognized gain of $37,017.77. Petitioner contends that if the two "transactions" are considered together, then the consideration given and received by each party totals $77,017.77. Petitioner's argument, apparently based on the premise that petitioner paid $40,000 to Walsh by issuing stock and $37,017.77 by crediting the loan account, is without merit. Clearly, the net effect of the transaction was that petitioner transferred $40,000 in stock and received $40,000 in assets ($37,017.77 in molds and $2,982.23 debit to loan account). To accept petitioner's argument would result in giving independent significance to each of the steps which have been held to constitute but one, indivisible transaction. Walsh did not receive $77,017.77, nor was any gain recognizable.

In summary, the carryover basis provision of section 362 results in petitioner's having an adjusted basis of zero in the molds, thereby precluding any casualty loss deduction under section 165.[8]

*Decision will be entered for the respondent.*

---

[8]In view of this conclusion, we need not address respondent's alternative argument that Walsh's "sale" of the molds was in fact a capital contribution, which also results in the application of the carryover basis requirements of sec. 362.