279 F.2d 657
 60-2 USTC P 9596
 WILBUR SECURITY COMPANY, Petitioner,
v.
COMMISSIONER OR INTERNAL REVENUE, Respondent.
 No. 16496.
 United States Court of Appeals Ninth Circuit.
 May 23, 1960.
 
 Paul Castoldi, Francis J. Butler, Spokane, Wash., for appellant.
 Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Robert N. Anderson, Mellvin L. Lebow, Sharon King, Attorneys, Department of Justice, Washington, D.C., for appellee.
 Before ORR, BARNES and KOELSCH, Circuit Judges.
 BARNES, Circuit Judge.
 
 
 1
 This timely petition for review of a decision of Tax Court involves deficiencies in corporate taxpayer's federal income tax for the years 1953, 1954 and 1955, in the amounts of $13,520.46, $17,254.17 and $17,254.18, respectively. This court has jurisdiction. 26 U.S.C. 7482.
 
 
 2
 The sole question is whether the above amounts paid by the taxpayer to certain individuals constituted dividends and not deductible interest.
 
 
 3
 Concededly, this is a question of fact. The determination of such question of fact by the Tax Court is conclusive on us, unless the conclusion is clearly erroneous. Fed.R.Civ.P. 52(a), 28 U.S.C.A. E.g. Earle v. W. J. Jones & Son, 9 Cir., 1952, 200 F.2d 846.
 
 
 4
 Here the evidence was conflicting as to whether the payments were in lieu of dividends or deductible interest. The argument made to this court, therefore, is of the kind usually and more appropriately made to the Tax Court. In our determination of the facts here present, as we have said so many times before, all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the judgment, if possible. It is an elementary principle of law that when a verdict is attacked as being unsupported, the power of this appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the trier of fact below. When two or more inferences can reasonably be deducted from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. The rule is as applicable in reviewing the findings of a judge as it is when considering a jury's verdict. 26 U.S.C. 7482(a); Fed.R.Civ.P. 52(a). It is as applicable to petitions for review from the Tax Court as to ordinary appeals. E.g. Earle v. W. J. Jones & Son, supra.
 
 
 5
 Due regard must be given to the Tax Court Judge's opportunity to weigh the credibility of witnesses. Any question as to the credibility of a witness or any determination of conflicts and inconsistencies in the testimony is for the trial court.
 
 
 6
 Following the foregoing rule, we find here evidence befoe us that in 1915, the corporation, Wilbur Security Company, was formed by the stockholders of the Wilbur State Bank located in Wilbur, Washington. The purpose of the company was to take money out of the small town bank, and they discourage competition from other banks moving in, as well as to provide a method for making long-term loans the bank could not carry legally. The capital stock of the new company was 250 shares of the par value of $100 per share, or $25,000. None of this was originally paid in. Article seven of the articles of incorporation restricted the sale of stock to anyone not already a stockholder without the permission of two-thirds of the stockholders.
 
 
 7
 Two hundred and twenty-five shares of those originally subscribed were to be issued to E. L. Farnsworth and John McPherson.
 
 
 8
 The taxpayer's incorporations subscribed to its stock in proportion to their stock interests in the bank. Thus, Farnsworth had forty-eight per cent, McPherson, forty-two per cent, Hudkins and Thompson, four per cent each and Oswalt, two per cent.
 
 
 9
 Less than one month after incorporation, these subscribing stockholders deposited a total sum of $200,000 with the company, following the same percentages, and crediting such sums to a 'Special Stockholder's Account.' By amendment to the by-laws at the time it was provided:
 
 
 10
 'When any stockholder sells any of his stock it is understood that $800 of his 'Special Stockholder's Account' shall be transferred with each share of stock sole. * * *'
 
 
 11
 This by-law, though perhaps forgotten (as is urged by petitioners) was never rescinded nor amended.
 
 
 12
 When this money was transferred by the bank's stockholders to the corporate taxpayer's open account, it never left the bank.
 
 
 13
 A year and eight months later (December 28, 1916) the taxpayer's board of directors set aside $25,000 of earnings (from the $200,000 in the 'Special Stockholder's Account') as paid in capital. Thus the capital of this corporation was paid for out of earnings 100%. The capital was originally so 'thin' as to be nonexistent.
 
 
 14
 For twenty-three years thereafter, until 1938, the capital of $25,000 and the total of the 'Special Stockholder's Account,' of $200,000 remained the same. During this time the individual interests in the account fluctuated with the stock ownership.
 
 
 15
 During this time, additional sums were deposited in a 'Special Account,' some by stockholders and some by nonstockholders, but in every case the nonstockholders were close relatives of McPherson or Farnsworth. D. K. McPherson's son, J. McPherson, started putting in additional sums in 1916, and the latter's two sisters (D. K. McPherson's daughters) in 1918, after D. K. McPherson's death. Grace Phillips, daughter of E. L. Farnsworth, started adding moneys in 1918. During the depression years, 1932 to 1936, inclusive, no interest whatsoever was paid on the two 'Special' accounts.
 
 
 16
 In 1937 and 1938 the taxpayer's returns were examined by the Commissioner; a deficiency was proposed in 1939, based on a disallowance of the interest deduction claimed. The taxpayer protested, and the government accepted the taxpayer's returns as correct.
 
 
 17
 In 1939, the 'Special Stockholder's Account' was 'paid off' and the moneys placed in a 'Special Accounts Payable.' In 1943 the 'Special Accounts Payable' were changed over to 'Bills Payable,' by the following resolution:
 
 
 18
 'It was duly moved, seconded and carried that all our Special Accounts Payable, on which we pay interest, shall be changed over to Bills Payable, as of January 1, 1943. That the Secretary shall prepare proper notes of the Wilbur Security Company for each of said Special Accounts Payable, dating same January 1, 1943, due one year after date, and bearing interest at rate of 5 per cent per annum. That, these said Bills Payable shall be signed for the Company by its President and attested by its Secretary.'
 
 
 19
 Thus for twenty-eight years this obligation was not represented by notes or any indicia of indebtedness save book entries of account. From 1943 to 1955 these notes were renewed each year, or the old notes were cancelled and new ones issued. The rate of 'interest' was fixed by the board of directors of the taxpayer, taking into account the taxpayer's earnings.
 
 
 20
 The trial court held these notes were never delivered to thier owners, but 'remained in the taxpayer's possession at all times.' This finding was challenged by petitioner, and rests on conflicting evidence, though there is evidence to support the finding.
 
 
 21
 In 1952 an unusual incident occurred. The rate of interest on the notes, fixed at five per cent on December 31st, 1951, was, on November 4th, 1952, increased to six per cent. This was done by the taxpayer, not by the owners (and presumably holders), of the notes.
 
 
 22
 A comparison of the amounts of the various accounts with the number of shares of stock, if any, of the note-holders is as follows:
 
 
 23
 E. L. Sarah A. Grace J. G.
Year Farnsworth Farnsworth Phillips McPherson Thompson
---- --------------- ------------ ---------- ------------------- --------------
1939 $169,790.55--90 $ $ $190,000.00--122 $16,000.00--20
 1/2
1940 157,790.55--90 187,000.00--122 16,000.00--20
 1/2
1941 81,081.47 73,096.74-- 171,000.00--102 16,000.00--20
 -90 1/2
1942 99,829.80-- 44,298.- 144,000.00--102 16,000.00--20
 -90 60 1/2
1943 96,829.80-- 50,298.- 144,000.00--102 16,000.00--20
 -90 60 1/2
1944 93,829.80-- 53,298.- 144,000.00--102 16,000.00--20
 -90 60 1/2
1945 90,829.80-- 56,298.- 144,000.00--102 16,000.00--20
 -90 60 1/2
1946 75,829.80-- 71,298.- 144,000.00--102 16,000.00--20
 -90 60 1/2
1947 72,829.80-- 74,298.- 144,000.00--102 16,000.00--20
 -90 60 1/2
1948 69,829.80-- 77,298.- 144,000.00--102 16,000.00--20
 -90 60 1/2
1949 66,829.80-- 80,298.- 144,000.00--102 16,000.00--20
 -90 60 1/2
1950 63,829.80-- 83,298.- 144,000.00--102 16,000.00--20
 -90 60 1/2
1951 63,829.80-- 83,298.- 144,000.00--102 16,000.00--20
 -90 60 1/2
1952 63,829.80-- 83,298.- 144,000.00--102 16,000.00--20
 -90 60 1/2
1953 63,829.80-- 83,298.- 144,000.00--102 16,000.00--20
 -90 60 1/2
1954 63,829.80-- 83,298.- 144,000.00--102 16,000.00--20
 -90 60 1/2
1955 147,128.- 144,000.00--102 16,000.00--20
 40--90 1/2
 
 
 24
 Elizabeth J. K. Kate Julia Catherine
Year E. H. Oswalt McPherson McPherson McPherson McPherson Bernhard
---- -------------- ------------ -------------- ---------- ---------- ---------
1939 $6,000.00--7 $4,000.00--5 $ 8,000.00--5 $87,000.00 $99,390.00
 1/2
1940 6,000.00--7 4,000.00--5 8,000.00--5 87,000.00 99,390.00
 1/2
1941 6,000.00--7 4,000.00--5 24,000.00--25 87,000.00 99,390.00
 1/2
1942 6,000.00--7 4,000.00--5 24,000.00--25 87,000.00 99,390.00 25,000.00
 1/2
1943 6,000.00--7 4,000.00--5 24,000.00--25 87,000.00 99,390.00 25,000.00
 1/2
1944 6,000.00--7 4,000.00--5 24,000.00--25 87,000.00 99,390.00 25,000.00
 1/2
1945 6,000.00--7 4,000.00--5 24,000.00--25 87,000.00 99,390.00 25,000.00
 1/2
1946 6,000.00--7 4,000.00--5 24,000.00--25 87,000.00 99,390.00 25,000.00
 1/2
1947 6,000.00--7 4,000.00--5 24,000.00--25 87,000.00 99,390.00 25,000.00
 1/2
1948 6,000.00--7 4,000.00--5 24,000.00--25 87,000.00 99,390.00 25,000.00
 1/2
1949 6,000.00--7 4,000.00--5 24,000.00--25 87,000.00 99,930.00 25,000.00
 1/2
1950 6,000.00--7 4,000.00--5 24,000.00--25 87,000.00 99,390.00 25,000.00
 1/2
1951 6,000.00--7 4,000.00--5 24,000.00--25 87,000.00 99,390.00 25,000.00
 1/2
1952 6,000.00--7 4,000.00--5 24,000.00--25 87,000.00 99,390.00 25,000.00
 1/2
1953 6,000.00--7 4,000.00--5 24,000.00--25 87,000.00 99,390.00 25,000.00
 1/2
1954 6,000.00--7 4,000.00--5 24,000.00--25 87,000.00 99,390.00 25,000.00
 1/2
1955 6,000.00--7 4,000.00--5 24,000.00--25 87,000.00 99,390.00 25,000.00
 1/2
 
 
 25
 The amount of surplus, dividends, salaries paid, and
interest paid between 1939 and 1955 is as follows:
 Interest Amts. Paid
 Paid on on Spec.
 Obligations Acct. or
 not in Bills Payable
Year Surplus Dividends Salaries Issue Acct.
---- ---------- --------- ---------- ----------- -------------
1939 $51,367.39 $5,000.00 $ None $ None $17,016.90
1940 52,734.52 7,500.00 None None 17,195.40
1941 56,741.77 7,500.00 None 203.33 21,559.50
1942 75,819.90 7,500.00 5,000.00 162.90 27,475.92
1943 69,140.93 7,500.00 5,000.00 None 27,596.75
1944 73,864.99 7,500.00 5,000.00 None 27,625.92
1945 79,082.44 7,500.00 5,000.00 None 27,625.92
1946 84,553,48 25,000.00 8,000.00 None 27,625.92
1947 98,158.21 25,000.00 12,000.00 None 27,625.92
1948 105,328.30 25,000.00 18,000.00 None 27,625.92
1949 109,838.21 25,000.00 18,000.00 None 27,625.92
1950 128,977.48 25,000.00 18,000.00 None 27,625.92
1951 129,107.95 25,000.00 18,000.00 None 27,625.92
1952 147,238.25 25,000.00 18,000.00 None 33,151.10
1953 147,541.62 25,000.00 18,000.00 None 32,311.10
1954 164,121.39 25,000.00 18,000.00 None 33,151.10
1955 166,872.50 25,000.00 18,000.00 None 33,151.10
 
 
 26
 In 1956 the account 'Bills Payable' was changed to 'Notes Payable.'
 
 
 27
 On the foregoing state of facts, the Commissioner disallowed all interest deductions, and held that the Bills Payable Account represented actual capital invested. The Tax Court affirmed, holding the amounts payable as interest in 1953, 1954 and 1955 were actually a distribution of dividends on equity capital.
 
 
 28
 It is conceded here that the burden of proving the payments were interest, was on the taxpayer. Gooding Amusement Co. v. Commissioner, 6 Cir., 1956, 236 F.2d 159, 166, certiorari denied 352 U.S. 1031, 77 S.Ct. 595, 1 L.Ed.2d 599; Bair v. Commissioner, 2 Cir., 1952, 199 F.2d 589, 591; Matthiessen v. Commissioner, 2 Cir., 1952, 194 F.2d 659, 661. It is likewise conceded by taxpayer that the Tax Court, and we, are required to consider the evidence in the light of eleven tests: (1) The name given to the certificates evidencing the indebtedness. (2) The presence or absence of a maturity date. (3) The source of the payments. (4) The right to enforce the payment of principal and interest. (5) Participation in management. (6) A status equal to or inferior to that of regular corporate creditors. (7) The intent of the parties. (8) Capitalization. (9) Identity of interest between creditor and stockholder. (10) Payments of interest only out of dividends. (11) Whether or not the corporation could have obtained loans from outside lending institutions.
 
 
 29
 With the possible exception of points (6) and (11), the other tests favor the Tax Court's conclusions, if we consider the entire history of operations during the forty year history of the corporation.[1] Yet, says petitioner, we should examine only the circumstances existing in the tax years 1953, 1954 and 1955. As an example, this would show notes actually executed, bearing a fixed rate of interest, and definite maturity dates. Yet such 'facts' would not truly portray the actual relationship between maker and holder of the notes. What the parties do is more important than what they say. The intent (Test 7) can only be determined by an examination of all the circumstances existing in the relationship between the corporation and the note-holders. Gregg Co. of Delaware v. Commissioner, 2 Cir., 1956, 239 F.2d 498, certiorari denied 353 U.S. 946, 77 S.Ct. 825, 1 L.Ed.2d 856; Talbot Mills v. Commissioner, 1 Cir., 1944, 146 F.2d 809, 811, affirmed 1946,326 U.S. 521, 66 S.Ct. 299, 90 L.Ed. 278.
 
 
 30
 We need not labor the point further, nor cite additional law. We cannot hold the decision of the Tax Court clearly erroneous, and we affirm.
 
 
 
 [1]
 There was in fact no fixed maturity date; so-called 'interest' payments depended upon the taxpayer's earnings; the determination of whether interest would be paid and the amount thereof was solely in the discretion of the taxpayer's board of directors; the notes were not paid on due dates; there was no attempt to enforce payment of the notes though due dates were annually violated; the advances were used broadly to enable the taxpayer to start its business and acquire all of its income-producing properties; the advances were unsecured; the notes were in fact not negotiable because they never left the taxpayer's possession; and outsiders would not have made the advances under like circumstances, to wit, for an indefinite length of time, in effect subject to the risks of the business, and the return thereon being exclusively within the discretion of the taxpayer's board of directors