UNIVERSAL CASTINGS CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 79407. Filed October 31, 1961.

*Robert A. Helman, Esq.*, and *Marshall G. Sampsell, Esq.*, for the petitioner.

*Joel Yonover, Esq.*, for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies in petitioner's income tax of $8,260 in 1953, $6,136 in 1954, and $6,136 in 1955. Petitioner deducted as interest payments to holders of its 5-percent income notes in each of the years in question. Respondent disallowed the deductions. The sole question for decision is the correctness of respondent's disallowance.

### FINDINGS OF FACT.

Some of the facts have been stipulated and they are found accordingly.

Petitioner, Universal Castings Corporation, is an Illinois corporation organized in 1934, engaged in the business of manufacturing castings. It filed corporation income tax returns for the calendar years 1953, 1954, and 1955 with the district director of internal revenue at Chicago, Illinois.

Prior to July 31, 1946, and through the end of 1955 petitioner had total capital stock of $130,475.04. Prior to July 31, 1946, and up to and including May 18, 1950, petitioner had issued and outstanding capital stock consisting of 1,566 shares no-par-value common and 1,142 shares of class A stock with par value of $66 per share. The class A

stock was preferred as to assets in the event of liquidation, dissolution, or winding up of the corporation, to the extent of its par value.

Prior to July 31, 1946, and up to and including May 18, 1950, said stock was owned as follows:

| Owner | Class A stock | Common stock | Total stock |
|---|---|---|---|
| Locomotive Firebox Company | 1,142 | 570 | 1,712 |
| Louise Carr Hodgkins Trust | | 696 | 696 |
| Walter S. Carr | | 300 | 300 |
| Total | 1,142 | 1,566 | 2,708 |

Locomotive Firebox Company was a publicly held Illinois corporation with about 700 shareholders. Walter Carr was president of Locomotive and chairman of the board of petitioner for much of the period 1946 through 1955.

In the summer of 1946 petitioner had an earned surplus deficit of about $340,000 and a net worth deficit of about $210,000. The corporation contemplated borrowing money from a Chicago bank. On the recommendation of the bank, petitioner asked Lester Knight, president of Lester B. Knight & Associates, Inc., a firm of management and engineering consultants, to make a review of its business. As a result of his study Knight recommended to Carr that certain changes be made in petitioner's operations and that the management be changed.

In August 1946 petitioner borrowed $250,000 for 5 years from the Chicago bank. The loan was evidenced by petitioner's note due July 21, 1951, bearing interest at 4 percent per year and providing for monthly principal payments of $4,630. The loan was secured by a chattel mortgage which covered all petitioner's fixed assets. The repayment of 75 percent of the principal amount of the loan was guaranteed by the Reconstruction Finance Corporation.

On the same day, petitioner's three shareholders loaned it a total of $150,000. The loans were made in the following principal amounts:

| | |
|---|---|
| Locomotive Firebox Company | $102,298.50 |
| Louise Carr Hodgkins Trust | 33,333.00 |
| Walter S. Carr | 14,368.50 |
| Total | 150,000.00 |

The loans were evidenced by petitioner's 5-year notes bearing interest at 5 percent per year. The bank required that all rights of the owners of these notes be subordinated to the rights of the bank under its note described above. Each of the notes contained a provision allowing the holder to appoint an attorney to confess judgment against petitioner in the event of default under the note.

About September 20, 1946, petitioner entered into a management contract with Knight Associates. The term of the contract extended

to the end of 1951 unless otherwise terminated. It provided, among other things, that Knight be named to petitioner's board of directors and that Knight Associates be paid a management fee of 25 percent of petitioner's net income before Federal taxes.

In October and November 1946 petitioner's three shareholders loaned petitioner an additional $50,000 in the following total amounts:

| | |
|---|---|
| Locomotive Firebox Company | $34, 099. 50 |
| Louise Carr Hodgkins Trust | 11, 111. 00 |
| Walter S. Carr | 4, 789. 50 |
| Total | 50, 000. 00 |

These loans were evidenced by demand notes bearing 5-percent interest per year. They also contained cognovit clauses.

The proceeds from the loans described above, in general, were used to pay off already existing obligations and to purchase equipment from another company which also manufactured castings. The loans were carried on petitioner's books as notes payable and were shown on its periodic financial statements as such.

Soon after Knight and Knight Associates took over the management of petitioner it began to show an operating profit. Its operations have been profitable each year since then.

In the spring of 1949 petitioner requested that the bank allow it to reduce the monthly principal payments on its loan. The bank and the RFC granted permission for the requested reduction subject to the following conditions which were accepted by petitioner's three shareholders: (1) The three shareholders would accept new notes aggregating $50,000 maturing August 21, 1951, with interest at 5 percent in exchange for the demand notes then outstanding; (2) petitioner, Locomotive Firebox Company, and Walter S. Carr would agree with respect to petitioner's notes aggregating $155,556 [1] (from the August 1946 borrowing) that:

(a) Interest on such notes will be paid quarterly only to the extent earnings of the company for the preceding quarter permit after payment of principal and interest installments on the [bank] loan, reserves for payments due [Knight Associates and another] * * * and reserves for Federal Income Taxes.

(b) No payments of interest will be made on notes unless at time such payments are due the ratio of [petitioner's] current assets to current liabilities exceed 1.5 to 1 and working capital exceeds $45,000.

The notes issued under the first condition above were to mature August 21, 1951. They carried interest at 5 percent per year and contained a cognovit clause. No interest payments were missed on any of the notes held by the shareholders described above.

---

[1] No explanation appears in the record for the seeming discrepancy between this amount and the stipulated $150,000 borrowed in Aug. 1946 which we have set forth in the Findings of Fact above.

As of May 18, 1950, the total principal amount of petitioner's notes held by its three shareholders and still outstanding was $200,000. They were owned as follows:

| | |
|---|---:|
| Locomotive Firebox Company | $136, 398 |
| Louise Carr Hodgkins Trust | 44, 444 |
| Walter S. Carr | 19, 158 |
| Total | 200, 000 |

The notes held by the shareholders as of this time will hereafter sometimes be called the old notes.

As of the same date, petitioner's liability to the bank had been decreased to about $42,750. At the end of May 1950 petitioner had a surplus deficit of $228,411.70 and a net worth deficit of $97,936.66. As of that time its credit and operating position were good. It was discounting all of its bills for operating expenses.

For some time prior to May 1950 petitioner had been doing a substantial amount of work for the Chrysler Corporation in connection with the development of torque converters for automatic transmissions. It had also been doing other work for Chrysler and the income from the Chrysler business represented a substantial portion of its total income. In the spring of 1950 Chrysler requested petitioner to make a proposal under which petitioner would furnish Chrysler with about half of Chrysler's torque converter casting requirements for its automobile lines. This business would have represented a sizable increase over any volume of business which petitioner had been doing or was capable of financing at that time. Petitioner estimated that it would require new equipment costing from $150,000 to $200,000 plus additional working capital.

Knight informed Carr that it would be to petitioner's advantage to be able to undertake the expansion necessary if Chrysler should award it the job. Carr was in the process of preparing to liquidate Locomotive Firebox Company and declined to make available to petitioner the additional funds necessary for the expansion. Knight responded by offering to purchase the stock and notes of petitioner then owned by Locomotive Firebox Company for about $90,000 and to allow Carr and the trust to maintain their stock interests in petitioner if they would exchange their notes for common stock. The offer was rejected by Carr and by the trust. However, the three shareholders offered to sell all of the petitioner's stock and notes, except the note owed the bank, to Knight for $150,000. Knight accepted.

Knight was not in a position to make the purchase alone. He approached several business acquaintances and friends and some agreed to participate in the purchase.

About May 18, 1950, petitioner's three shareholders sold all of petitioner's issued and outstanding stock and shareholder notes as follows: Locomotive Firebox Company sold its 1,142 shares of class A preferred stock, 570 shares of common stock, 5-percent note due August 21, 1951, in principal amount of $102,298.50, and its 5-percent note due August 21, 1951, in the principal amount of $34,099.50 (total note principal $136,398) and received $102,298.50 for them; the Louise Carr Hodgkins Trust sold its 696 shares of common stock, 5-percent note due August 21, 1951, in the principal amount of $33,333 and its 5-percent note due August 21, 1951, in the principal amount of $11,111 (total note principal $44,444) and received $33,333; and Carr sold his 300 shares of common stock, 5-percent note due August 21, 1951, in the principal amount of $14,368.50 and his 5-percent note due August 21, 1951, in the principal amount of $4,789.50 (total note principal $19,158) and received $14,368.50 for them.

The purchasers (hereafter sometimes called the Knight Group) were:

Lester B. Knight and Associates, Inc.
Rogers & Tracy, Inc., a Chicago investment firm.
Mr. L. E. Everett of Chicago, an employee of Lester B. Knight and Associates, Inc.
Mr. Walter Glass of Chicago, a business acquaintance of Mr. Lester B. Knight.
Mr. Willett Gorham of Chicago, a business acquaintance of Mr. Lester B. Knight.
Mr. Carl H. Muth of Chicago, vice president of Universal.
Mr. J. M. Planten of Chicago, an employee of Lester B. Knight and Associates, Inc.
Mr. D. F. Webb of Chicago, a business acquaintance of Mr. Lester B. Knight, and
Mr. W. G. Wilkins of Chicago, president of Universal.

About May 18, 1950, the Knight Group amended petitioner's articles of incorporation to increase and change petitioner's authorized capital stock from 5,000 shares of no-par-common and 1,500 shares of $66-par-value class A preferred to 10,000 shares of no-par-common and to change the 1,566 shares of outstanding common and 1,142 shares of outstanding class A preferred into 1,500 shares of common. The change was made solely to simplify petitioner's capital structure. No change was made in its stated capital account which remained, as before, with a balance of $130,475.04.

In addition, at about the same time the Knight Group agreed to and did exchange petitioner's old notes for new ones in the same principal amount ($200,000). The new notes carried interest at 5 percent and were due January 1, 1971.

After the exchanges of stock and notes described above the shares of stock, new notes, aggregate cost of shares and notes, and percentage owned by each shareholder were as follows:

| Shareholder | Number o shares | Principal amount of new notes | Aggregate cost of shares and new notes | Percentage of shares and new notes |
|---|---|---|---|---|
| | | | | Percent |
| Lester B. Knight & Associates, Inc. | 1,005 | $134,000.00 | $100,500 | 67 |
| L. E. Everett | 40 | 5,333.33 | 4,000 | 2⅔ |
| Walter Glass | 50 | 6,666.67 | 5,000 | 3⅓ |
| Willett N. Gorham | 50 | 6,666.67 | 5,000 | 3⅓ |
| Carl H. Muth | 20 | 2,666.67 | 2,000 | 1⅓ |
| J. M. Planten | 10 | 1,333.33 | 1,000 | ⅔ |
| Rogers & Tracy, Inc. | 100 | 13,333.33 | 10,000 | 6⅔ |
| D. F. Webb | 25 | 3,333.33 | 2,500 | 1⅔ |
| W. G. Wilkins | 200 | 26,666.67 | 20,000 | 13⅓ |
| Totals | 1,500 | 200,000.00 | 150,000 | 100.00 |

The shares of stock and the new notes were held by the Knight Group in the same proportion as the total amount of their investment bore to the whole amount invested.

The new notes were entitled "5% INCOME NOTE[s]" and were due January 1, 1971. They provided that interest became due only if petitioner's net working capital as of December 31 of each year upon which the interest payment was based was not less than $50,000; if, as of December 31 of such year, its ratio of current assets to current liabilities was not less than 1.5 to 1; and if "Available Net Income" (defined below) was sufficient to pay all of the interest due on the aggregate amount of all of the notes then outstanding. The first two of these provisions were substantially the same as the conditions imposed by the bank and the RFC in 1949 and which were still in force when the new notes were issued. "Available Net Income" was defined in the new notes as:

"Available Net Income" of the Corporation for any calendar year shall mean an amount determined as follows: (1) the net income of the Corporation for such year shall be computed, on the accrual basis without regard to interest on the Notes in accordance with accepted principles of accounting by the certified public accountants employed by the Corporation to examine the books of account of the Corporation for such year, by deducting from the total net sales and other income of the Corporation (a) all costs of goods sold, including royalties; (b) all general operating expenses, including engineering and profit sharing expense; and (c) all other proper deductions from income, including particularly but not exclusively (i) current maintenance and repairs; (ii) rentals; (iii) insurance; (iv) pensions; (v) all charges or provisions for depreciation, retirements, renewals, replacements and amortization; (vi) all reserves reasonably established by the Board of Directors for working capital, contingencies, improvements, acquisition or construction of buildings, machinery or equipment, or for any other reasonable and customary purpose; (vii) all charges or provisions for federal, state and local taxes, paid or accrued, and interest and penalties thereon; and (viii) interest, paid or accrued, other than interest on the Notes, and (2) such net income so computed for such year, if any, shall be increased to reflect any reduction in taxes which would result from the payment of interest on the Notes with respect to such year.

The new notes also provided in part as follows:

All rights of the holder of this Note, except the rights to receive interest as herein provided, prepayments of principal if and when justified in the opinion of the Board of Directors by the financial condition of the Corporation, and payment of the unpaid balance, if any, of the principal hereof on January 1, 1971, shall be subordinate to the rights of all other creditors of the Corporation for any and all indebtedness of the Corporation now existing or hereafter incurred.

Under date of July 1, 1950, Knight, Knight Associates, the Knight Group, and the corporation entered into an agreement entitled "SHAREHOLDERS AGREEMENT," which provided, in part, that the shares and notes could not be transferred, sold, or given away by any holder unless all of such shares and notes held by the party were so transferred at the time. The agreement also provided that Knight, Knight Associates, and petitioner were to be given, respectively, the first, second, and third options to buy any shares and notes of the shareholders offered for sale. The agreement further provided that a transfer of stock or notes in violation of the agreement would be void.

The full amount of the new notes was entered on petitioner's books in a notes payable account as of July 1, 1950, the date of issue. They were carried in that account during the taxable years in issue and appeared on petitioner's financial statement as "Noncurrent Liability, 5% Income Notes * * *."

Sometime late in the fall of 1950 after the new notes had been issued petitioner learned that Chrysler had decided to give its entire castings order to General Motors Corporation and that petitioner would receive none.

Petitioner has paid the 5-percent interest on the new notes each year since they were issued. No dividends were declared or paid by petitioner on any of its stock outstanding from 1946 through 1955.

Petitioner had operating profit surplus (deficits) and net worth for the years 1946 through 1955 as follows:

| Year | Surplus (deficit) | Net worth (deficit) | Year | Surplus (deficit) | Net worth (deficit) |
|------|------|------|------|------|------|
| 1946 | ($358,053.26) | ($227,578.22) | 1951 | ($91,015.43) | $39,459.61 |
| 1947 | (303,197.07) | (172,722.03) | 1952 | (58,195.95) | 72,279.09 |
| 1948 | (268,886.40) | (138,411.36) | 1953 | (6,436.93) | 124,038.11 |
| 1949 | (243,111.07) | (112,636.03) | 1954 | 32,831.30 | 163,306.34 |
| 1950 | (165,070.29) | (34,595.25) | 1955 | 75,705.74 | 206,180.78 |

Petitioner's ratio of long-term debt to common stock plus retained earnings (deficit) for the years in question was:

For 1953, 1954, and 1955, the tax years here in question, the new notes constituted petitioner's only liability other than current liabilities incurred in the normal course of petitioner's business operations.

Petitioner's ratio of long-term debt to common stock plus retained earnings (or deficit) as of December 31 of each of these years was:

1953—$200,000 to $124,038.11 or 2 : 1.24.
1954—$200,000 to $163,306.34 or 2 : 1.63.
1955—$200,000 to $206,180.78 or 2 : 2.06.

In each of the years in question petitioner paid the holders of the new notes interest totaling $10,000 and deducted it as such on its corporate tax returns. Respondent determined the deficiency by disallowing this deduction and explained "that the securities on which the payments are based are more nearly like preferred stock than indebtedness."

OPINION.

The question in this case is whether the corporation is entitled to a deduction for interest on the new notes. In order that this question be resolved in its favor, petitioner must show that a debt existed. Petitioner argues that respondent accepted the old notes as evidencing true debt (and indeed respondent agrees on brief that they did). It then contends that the new notes were not substantially different from the old and maintains that any differences which exist are not enough to indicate that no debt existed. It is at this point, we believe, that petitioner's reasoning begins to crumble. We are almost totally unconcerned with the old notes. The years in which they were outstanding are not before us. They were held by persons entirely different from the holders of the new notes who stood in relationships to the corporation which bear scant resemblance to the relation of the new holders. Upon the transfer of ownership, the new notes were immediately substituted for the old. We are here concerned only with the new notes and the intents and designs of the parties as to them. When the record is examined in this light, we are convinced that no debt appears.

The judicially developed list of common indicators of the presence or absence of indebtedness is a long one growing larger. See, e.g., *Wilbur Security Co.* v. *Commissioner*, 279 F. 2d 657, affirming 31 T.C. 938, and *O.H. Kruse Grain & Milling* v. *Commissioner*, 279 F. 2d 123, affirming a Memorandum Opinion of this Court. It is not enough when examining such a precedential checklist to test each item for its presence or absence, but it is necessary also to weigh each item. We discuss below some of the factors which we consider most significant to the result we reach.

Five of the shareholder-noteholders in addition to Knight testified at the trial of the case. The clear purport of their testimony was that they placed their money in the business in the expectation of a speculative profit as a result of the then lambent earning potential of the

business, not to receive interest on their money. For example, Daniel Webb testified that when he bought into the deal he "bought a package. * * * To me it represented an opportunity to perhaps make some money. I expected that the investment would increase * * *." Four of these five investors testified they made no allocation of the amounts they paid as to portions for stock and portions for notes. Walter Glass testified as to his $5,000 investment: "Primarily, my total concern was equity * * *" and he further stated he did not intend to loan money to the corporation.

Petitioner admits that a part of the amounts paid were for the stock. The new notes were locked to the stock by the shareholders' agreement. Neither could be sold without the other and the corporation and Knight Associates had the right of first refusal of the package. A locked-in transaction such as this implies that a "single" investment exists. See *Earl R. Wilkinson*, 29 T.C. 421. The testimony that the intent of the investment was to place money at the risk of the business rather than to place it to return interest is persuasive of the absence of the vital debtor-creditor relationship.

Another feature that results from locking the notes to the stock is that the noteholders in effect participate fully in management, albeit by wearing the hat of a shareholder. This is true not only at the outset, but also for the entire period during which the notes were outstanding. Because the notes could not be separated from the stock, it was impossible that at any time the interests of the noteholder group would differ from those of the shareholders. The right to participate in shareholder functions is an indication of equity ownership rather than debt.

The payment of interest on the notes is directly under the control of the holders of the notes. By the terms of the notes, interest is not cumulative. Once missed it is forever lost. The payment of interest is made dependent on "Available Net Income" which is then painstakingly defined by the notes to mean something other than the ordinary conception of net income. The clause in the notes shows, in the final analysis, the presence of available net income is dependent upon the discretion of the board of directors.[2] The board is appointed by the noteholders. Thus, the noteholders themselves can control whether or not interest is paid. A dissenting noteholder has no clearcut right to enforce the payment of interest on his debt if the remainder of the noteholders, through the board of directors, decide no interest is to be paid because his challenge is based on the discretion of the board rather than on an objective standard.

---

[2] " 'Available Net Income' * * * shall mean an amount * * * [after] (vi) all reserves reasonably established by the Board of Directors for working capital, contingencies, improvements, acquisition or construction of buildings, machinery or equipment, or for any other reasonable and customary purpose ; * * *"

116

Petitioner argues that *John Kelley Co.* v. *Commissioner*, 326 U.S. 521, reversing 146 F. 2d 466, which reversed 1 T.C. 457 "appears to be closer than any other" case to this one and compels a result in petitioner's favor. We think *Kelley* is not persuasive. That *Kelley* was a close case is apparent from the dissents in the Supreme Court opinion and from our holding in what subsequently developed as *Kelley's* companion case, *Talbot Mills* v. *Commissioner*, 326 U.S. 521, affirming 146 F. 2d 809, affirming 3 T.C. 95, which was decided adversely to the taxpayer. The difference between the facts in *Kelley* and *Talbot*, though relatively slight (one dissenting Supreme Court Justice termed the facts "substantially identical"), was sufficient to compel different treatment. Here, too, the facts are sufficiently different from *Kelley* to compel a different result.

In the *Kelley* case a closely held corporation issued $250,000 worth of income bonds with noncumulative interest at 8 percent. They were offered only to shareholders but were assignable. They were payable in 20 years with payment of interest conditioned upon the sufficiency of net income. They were subordinate to the rights of all creditors and superior to the rights of shareholders. They were redeemable at the option of the corporation. Bondholders had no right to participate in management. The bonds were issued, in part, in exchange for outstanding preferred stock. Unissued bonds were to be sold to shareholders. The purpose for the issuance of the bonds was to raise additional capital to expand the business of the corporation. The bonds were referred to as stock in some instances on the books of the corporation. The corporation's assets substantially exceeded its liabilities in the year in which the bonds were issued.

The factual differences between this case and *Kelley* are readily apparent and most run contrary to petitioner's position. Here the notes were not assignable without the acquiescence of the corporation and/or Knight and they could not be separated from the stock. Noteholders were thus assured of continuing participation in management by virtue of the locked-in feature. No interests adverse to either the stock or the notes could be created. Interest payments were to be made out of net income, not as commonly understood, but as carefully defined in the notes. The presence or absence of this artificially defined income was largely at the discretion of the board of directors rather than according to some objective standard beyond the ultimate control of the noteholders. Although petitioner argues that the noteholders could sue in the event of default, no default would exist if the directors, in the exercise of their discretion, prevented the earnings as defined in the notes from arising. In addition, although petitioner maintains that there existed an "unqualified obligation" to repay principal at the end of 20 years, the enviable position of the note-

holders and their unshakable control of management considerably tempers the unqualified character of any repayment obligation.

In our decision in *Kelley* we gave special consideration, among other things, to the fact that interest was to be paid out of net income as commonly understood, that the bonds contained an acceleration provision, and that the bondholders did not have the right to participate in management. We are aware, as petitioner points out, that some of these factors have been present in other cases decided in taxpayers' favor. That hardly detracts from their significance in this particular case, however.

On balance, we conclude that *Kelley* is of no assistance to petitioner here. On the contrary, as a borderline case, it emphasizes several of the factors which show with some force that petitioner is not entitled to the deduction it seeks.

Petitioner argues that all of the provisions in the notes were included in response to business necessity. Of this we have no doubt and, indeed, we have set forth in fulsome detail in our Findings of Fact the purposes which led up to their inclusion. That the notes were the carefully drafted results of the needs of this particular business at a given point in its history does not alter our search for the true relationship between the parties to the notes. All such an argument means is that the needs of the business could best be met by instruments which did not create the debtor-creditor relationship. The locked-in notes and stock constituted a single investment. The testimony of several of the investors demonstrates that they entered the transaction as speculative investors, not as debtors.

We hold that the notes in question were not debt of the corporation and that the payments on account of them during the years in question do not qualify for deduction as interest.

*Decision will be entered for the respondent.*