Wynnefield Heights, Inc. v. Commissioner.Wynnefield Heights, Inc. v. CommissionerDocket No. 5015-64.United States Tax CourtT.C. Memo 1966-185; 1966 Tax Ct. Memo LEXIS 98; 25 T.C.M. (CCH) 953; T.C.M. (RIA) 66185; August 9, 1966*98 Held, funds advanced by unrelated partnership to petitioner corporation were not capital contributions but constituted bona fide loans; accordingly, amount paid for use of such funds constituted deductible interest. Held further, petitioner was entitled to deductions claimed for office services. Leon Meltzer, 1529 Walnut St., Philadelphia, Pa., for the petitioner. Albert J. O'Connor, for the respondent. RAUMMemorandum Findings of Fact and Opinion The Commissioner determined deficiencies in the income tax of petitioner for its fiscal years ended April 30, 1959 and 1960 in the amounts of $63,855.26 and $55,287.89, respectively. The principal issue is whether certain payments made by petitioner in those years were deductible*99 as interest on indebtedness. Also in question is whether certain amounts paid or accrued by petitioner constituted deductible expenses for "office services" provided by a proprietorship owned by petitioner's president. Findings of Fact The stipulated facts and the exhibits attached thereto are incorporated herein by this reference. Harry Madway and Bernard Weinberg, not related to one another by blood or marriage, were each engaged in various phases of the real estate and construction business. They decided to unite their efforts in the development of a tract of land in Philadelphia, Pennsylvania, and to build 350 houses thereon. Madway's interest in the project was represented by petitioner, Wynnefield Heights, Inc. (hereinafter referred to as Wynnefield), a corporation which became the owner of the property; and Weinberg's interest was represented by National Construction Company, a corporation that became the prime contractor for the project. Wynnefield was incorporated October 28, 1954, with authorized and issued capital stock of 2,500 shares, with a par value of $1 per share. It filed its corporate income tax returns on an accrual basis for the taxable years ended April 30, 1959 and*100 1960 with the district director of internal revenue at Philadelphia, Pennsylvania. Wynnefield's stock was at all times pertinent owned or controlled by members of the Madway family, with Harry Madway as the dominant stockholder. Its stockholders of record were as follows: Number ofStockholderSharesHarry Madway835Samuel Madway565Ralph Madway565Pauline Margolis *335Madway Foundation200Total2,500National Construction Company was organized on October 28, 1954, with authorized and issued stock of 2,500 shares, with a par value of $1 per share. It filed its corporate income tax returns on an accrual basis for the taxable years ended April 30, 1959 and 1960 with the district director of internal revenue at Philadelphia, Pennsylvania. At all times pertinent, Weinberg was the sole stockholder of record of National. At all times pertinent, Wynnefield's officers were: Bernard WeinbergPresident and TreasurerHarry MadwayVice President and Secre-tarySamuel MadwayVice PresidentMorris GrossVice President and Assist-ant TreasurerE. J. HarrisonAssistant SecretaryIrwin FeldermanAssistant Secretary*101 At all times pertinent, National's officers were: Harry MadwayPresident and TreasurerSamuel MadwayVice PresidentBernard WeinbergVice President and Secre-taryMorris GrossVice President and Assist-ant TreasurerIrwin FeldermanAssistant SecretaryFor its participation in the project, National (the prime contractor) received reimbursement from Wynnefield of all costs incurred by National plus 50 percent of the profits from the project. Wynnefield purchased 29.25 acres of vacant ground in Philadelphia for $300,000, subject to a purchase money mortgage of $200,000. About 25 acres thereof were allocated to the housing project, the remaining acreage being "optioned" to Weinberg. Although construction loans were available for use in building the houses, an additional $300,000 was required for the project, which Weinberg and Madway thought Wynnefield would be unable to borrow from conventional banking sources. In the summer of 1955 Weinberg and Madway, on behalf of Wynnefield, met with William Chanoff, Lawrence G. Horowitz and William H. Sylk (hereinafter sometimes collectively referred to as the promoters) in an effort to raise that $300,000. *102 An arrangement was worked out whereby the promotors would obtain the required $300,000 from various sources for Wynnefield and, as the houses were built and sold, Wynnefield would repay that amount plus an additional amount (in accordance with a fixed schedule) equal $500to per house or a total of $175,000, "in lieu of interest" for the use of the funds advanced. Through the efforts of the promoters, a partnership was formed, known as Wynnefield Investtors, which advanced the $300,000 to Wynnefield. The partnership had a capital of $10,000, of which $2,500, or one-fourth, was paid in by the promoters. The remaining three-fourths was supplied by various persons known as the "Investing Partners". These were the persons who were solicited by the promoters to put up the required cash. Such cash was supplied in units of $4,100 each, $100 being capital paid into the partnership and $4,000 lent to the partnership. The promoters "sold" 75 units to various persons - the "Investing Partners" , thereby obtaining the funds advanced by the partnership to Wynnefield. The "Investing Partners" were some 40 in number, who acquired from one-half to five units each. Neither the promoters (sometimes*103 referred to as the "Other Partners") nor the "Investing Partners" were related in any way to any member of the Madway or Weinberg families. The promoters were to be compensated for their efforts through their one-fourth interest in the distributable profit of the partnership. Weinberg, Madway and the three promoters individually guaranteed that Wynnefield would meet its obligations to the partnership. At that time Weinberg had a net worth of approximately $1,500,000 and Madway had a net worth of approximately $450,000. Both were known as persons who had been successful in real estate ventures. Neither the partnership nor any of its members ever exercised any management functions relating to Wynnefield or National. The foregoing arrangement for creation of the Wynnefield Investors partnership and the advance of $300,000 by it to Wynnefield is set forth in an agreement of August 15, 1955 between Wynnefield (referred to as the "Borrower"), Wynnefield Investors (referred to as the "Lender"), and Weinberg, Madway, Sylk, Horowitz and Chanoff (referred to as "Guarantors"), which provided in part as follows: 1. Borrower hereby represents: (a) That the tract hereinabove referred to is*104 the former site of the polo field of the Philadelphia Country Club situated south of the Presidential Apartments and having direct access to the West River Drive since the recent realignment of Neill Drive. (b) That the tract has been rezoned as a "D" Residential area permitting the construction of row houses thereon and has been sub-divided into approximately 350 lots with a minimum individual frontage of 18 feet and minimum individual depth of 100 feet. (c) That the Veterans Administration and the Federal Housing Administration have indicated their respective approvals of the sub-division program, the general development plan and the plans and specifications for the specific houses. (d) That by appropriate Ordinances the City of Philadelphia has authorized the grading of the streets and the construction of the storm and sanitary sewers proposed to be installed for the purpose of the initial portion of the project and that building permits have already been issued for the initial group of twenty-two (22) houses proposed to be erected. (e) That construction on the initial group of twenty-two (22) houses is expected to begin within the next several weeks and it is contemplated*105 that the sample house for this initial group will be completed on or about October 1955. (f) A Veterans Administration Certificate of Reasonable Value in the sum of $16,350.00 for the basic inside house has been received for a group of 46 houses. Because the certificate was issued prior to July 31, 1955, this group will be eligible to receive "no down payment" mortgages for a thirty year term. F.H.A. has issued a commitment to the Borrower covering the 20 inside houses in the first group based on a $15,500.00 valuation. The F.H.A. commitments for the two end houses are pending. (g) That under normal merchandising techniques the buyer reaction to the initial group of houses will determine the merchandising program for the balance of the development. Assuming a satisfactory buyer acceptance, it is contemplated that construction on additional sections will start in the spring of 1956 and under a normal building and sales program the project should be entirely completed and sold by the end of 1957. 2. (a) Borrower will repay to Lender said principal sum of $300,000 and the further sum of $500 per house in lieu of interest (but hereinafter referred to as interest) in the manner and*106 at the times hereinafter set forth. (b) Upon the settlement of each of the first 200 houses, Borrower will pay to Lender out of settlement proceeds the sum of $500 per house. (c) Upon the settlement of the next 150 houses, Borrower will pay to Lender out of the settlement proceeds the sum of $2500 per house. 3. (a) If at any time prior to the sale and settlement of any houses Borrower shall sell the tract of land, Lender shall be entitled to the repayment in full of the loan of $300,000 plus 10% thereof, and thereon. (b) If at any time after any houses are sold and settled, Borrower shall sell the remaining tract of land, the 63% of the proceeds theretofore received by Lender from and out of the previous settlements shall be considered as repaid principal and Borrower shall be obligated to pay Lender the balance of the loan, plus a sum equal to 10% of such balance. To illustrate, if after the settlement of 100 houses, Borrower sells the remaining portion of the tract, Lender will have received $50,000 of which 63% or $31,500 will be considered as payment on account of principal and the balance thereof, $18,500, will be considered as payment on account of interest, leaving an*107 unpaid balance of principal in the amount of $268,000. Thereafter, from and out of the settlement for the sale of the remaining land, Borrower shall be obligated to pay to Lender the said balance of principal in the amount of $268,000, plus $26,850 as interest, in addition to the said sum of $50,000 previously paid, or a total of $345,350. (c) As hereinbefore set forth in Paragraph 1, it is contemplated that sample houses will be completed on or about October, 1955. If, in the opinion of the Borrower, the demand for said sample houses does not warrant the continued erection of said houses, Borrower in its sole discretion may either erect new sample houses or cease further building operations. If Borrower decides not to proceed with further building operations it shall so advise Lender on or before May 1, 1956 and shall repay to Lender on or before November 1, 1956 the total monies loaned to Borrower by Lender pursuant to this agreement, plus 5% thereof if no houses have been sold and settled prior to the time of such repayment, and thereupon Borrower and Guarantors shall have no further obligation to Lender. (d) If, pursuant to Paragraph 3(c) hereof, Borrower shall advise Lender*108 on or prior to May 1, 1956 of its election not to proceed with further building operations, and any houses shall have been sold and settled prior to the date of repayment provided for in said Paragraph 3(c), then 63% of the proceeds theretofore received by Lender from and out of the previous settlements shall be considered as repaid principal and Borrower shall be obligated to pay Lender at the time of repayment the balance of the loan plus a sum equal to 5% of such balance and thereupon Borrower and Guarantors shall have no further obligation to Lender. (e) If pursuant to Paragraph 3(c) hereof, Borrower shall advise Lender on or prior to May 1, 1956 of its election not to proceed with further building operations, but Borrower shall sell the tract prior to repayment of the loan plus interest thereon as hereinbefore provided, and no houses shall have been sold and settled prior to the time of repayment, then and in such event Borrower shall repay to Lender at the time of repayment the total monies loaned to Borrower by Lender plus 10% thereof and thereupon Borrower and Guarantors shall have no further obligation to Lender. (f) If pursuant to Paragraph 3(c) hereof, Borrower shall*109 advise Lender on or prior to May 1, 1956 of its election not to proceed with further building operations, but Borrower shall sell the tract prior to repayment of the loan plus interest thereon as hereinbefore provided, and any houses shall have been sold and settled prior to the time for repayment of the loan, then 63% of the proceeds theretofore received by Lender from and out of the previous settlements shall be considered as repaid principal and Borrower shall pay Lender, at the time of repayment, the balance of the loan plus a sum equal to 10% of such balance and thereupon Borrower and Guarantors shall have no further obligation to Lender. 4. (a) Lender shall acquire the $300,000 to be loaned Borrower in the following manner: (i) Lender's capital structure shall consist of $10,000 representing partners' capital and $300,000 representing loans made by some of the partners. The partners making such loans shall be known as "Investing Partners" and shall own and contribute seventy-five percent (75%) of the partners' capital. For convenience, in reference herein, the total capital to be supplied by Investing Partners, aggregating $307,500, will be considered as being composed of*110 seventy-five (75) units of $4,100 each as follows: Loans$4,000Capital100$4,100(ii) The total available funds of Lender, aggregating $310,000 as hereinabove set forth, shall be provided as follows: Investing Partners - 75 units of $4,100each$307,500Other Partners - 25% of Partners'Capital2,500Total Funds$310,000 It is here stated and represented that the partners other than Investing Partners shall consist of the individual parties hereto and referred to as Guarantors". 1(b) The funds of Lender, when available for distribution, shall first be applied to the repayment of the loans made by Investing Partners. After such loans shall have been repaid, all funds remaining shall be divided among the partners in accordance with their respective interest therein. Thus, the profit for each unit of $4,100 purchased by the Investing Partners, if 350 houses are constructed, sold and settled in the*111 manner hereinbefore set forth, will be $1,750, or an approximate return of 42.6% on the $4,100 invested. This would be determined as follows: Proceeds of sale of first 200 homes- $500 each$100,000Proceeds of sale of remaining 150homes - $2,500 ea.375,000Total received by Lender$475,000Less: Repayment of Loans to In-vesting Partners 75 units of $4,000each300,000Profits remaining for Partners$175,000Percentage of Investing Partners75%Profits of Investing Partners$131,250Profit for each of 75 units$ 1,7505. The $300,000 herein agreed to be borrowed and lent shall be paid by Lender to Borrower in two equal payments, the first of which shall be paid upon execution of this agreement and the balance paid on or before December 31, 1955. Borrower shall deposit the said loan so received in its regular bank account and shall not use any portion of said funds except for the purpose of developing the project and to repay monies in the approximate amount of $150,000.00 heretofore advanced to Borrower by its officers. Should further funds be required for the development of the project or for the completion, sale and settlement of the houses*112 erected thereon, Borrower shall make or cause to be made available all funds necessary for such purposes. 6. Any Investing Partner may withdraw from the Lender Partnership on or after December 31, 1957 by notice in writing to Lender and Borrower and upon receipt of said notice of intention to withdraw, Borrower shall repay to the withdrawing Partner, within a period of six months thereafter, that portion of the $300,000 advanced by such withdrawing Partner, and thereupon such withdrawing Partner shall have no interest in Partnership and no further claim against Lender, Borrower or Guarantors. Receipt of such notice shall not relieve Borrower from its obligation to pay to the Lender $500 on each house sold and settled prior to repayment of such portion of the loan; and such withdrawing Partner shall be entitled to receive from Lender his share of the interest due on houses sold and settled prior to repayment by Borrower of such portion of the loan. After such repayment of any portion of the total loan of $300,000, the amount of interest payable by Borrower to Lender shall be proportionately reduced. Thus, if upon demand of any Partner, the sum of $30,000 or 10% is repaid, the Borrower*113 shall thereafter be obligated to pay to Lender as interest only the sum of $450 per house from and out of the proceeds of each settlement. Except as herein provided in Paragraph 3 hereof, Borrower may not voluntarily repay any part of the $300,000 for the purpose of thereby reducing, either in whole or in part, the $500 interest obligation aforementioned. If the tract is sold after receipt of notice of withdrawal by any or all of the Partners, the sum due such withdrawing Partner or Partners shall nevertheless be limited to the foregoing. By reason of the preliminary work of Wynnefield, as set forth in paragraph 1(a) through 1(f) of the above agreement, the 25 acres to be devoted to the development became worth about $2,000 per lot or a total of about $700,000. At the time the agreement was entered into, the participants expected that the entire housing project would be completed and the entire $300,000 repaid together with the additional amount of $175,000 (at the agreed rate of $500 per house) by December 31, 1957. However, the project was not in fact completed for two or more years after that date, and, as a consequence of the ensuing delay in receiving full payment, the promoters*114 undertook to exert pressure upon Weinberg and Madway to increase the amount payable in respect of each house sold. Although there was resistance to these requests, the amount payable upon the sale of each remaining house was increased in 1958 from $500 to $575. The $75 increase was to be available only to the original investors and not to any outside purchaser of the interest of an "Investing Partner". It was also agreed that in the event of withdrawal of an Investing Partner from the venture, the promoters ("Other Partners") were to have the right of first refusal to purchase his interest, with Wynnefield itself having the right of second refusal; outside purchasers were to be approved by the partnership. Some of the "Investing Partners" in fact withdrew, and, in each instance, their interest was acquired by the "Other Partners" although the obligation to repay remained that of Wynnefield. Madway was "unhappy" about the $75 additional payment, and a request for a second increase in payment per house was refused in 1959. In accordance with the terms of the above agreement of August 15, 1955, as modified, Wynnefield, in addition to repayment of the $300,000, paid the following amounts*115 to Wynnefield Investors and deducted them on its returns as "Participants Share of Income": Amount DeductedReturn foras ParticipantsFiscal YearShare of In-Endedcome4-30-57$ 9,946.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,390.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,136.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,200.80$190,675.00 Chanoff, Horowitz and Sylk (as "Other Partners") had contributed a total of $2,500 to the capital of the partnership, and, as the owners of 25 percent of the capital of the partnership, received 25 percent of the above sum of $190,675 under the agreement. In addition they received proportionate distributions in respect of the units which they purchased from those "Investing Partners" who had withdrawn from the partnership. Madway and Weinberg received no portion of the foregoing $190,675. Wynnefield's corporate balance sheets, per returns, show the following: Total Lia-CapitalEarned Sur-Year EndedTotal AssetsbilitiesStockplus4-30-58$826,684.74$806,063.22$2,500.00$18,121.424-30-59765,747.05730,232.062,500.0033,014.994-30-60183,540.76128,365.272,500.0052,675.49Office Services expense. The carrying out of the project of*116 developing the 25 acres, building 350 houses thereon and selling such houses involved three entities, Wynnefield, National and Builders Development and Service Co. (referred to herein as "Builders"), a sole proprietorship owned by Weinberg. Wynnefield was the "owning" corporation and had very little to do with the actual work involved. National was the prime contractor. Builders was a service organization that furnished office and other related services in connection with building projects in which Weinberg was interested. The services provided by Builders in connection with the project here under review included to some extent the following: supervision of construction, negotiation of subcontracts, purchasing of materials, setting up of construction loans, making of disbursements, keeping of records, selling of homes, processing of buyers in order to obtain F.H.A. and V.A. mortgages, and actual settlement for homes sold. In addition to the services performed for Wynnefield by Weinberg himself, who received no compensation from eitherwynnefield or National, the following persons on the payroll of Builders who were not paid by either Wynnefield or National, devoted time to Wynnefield: *117 Morris Gross, who was vice president and assistant treasurer of both Wynnefield and National, devoted 2 1/2 to 3 days per week in supervising construction; Irwin Felderman, who was assistant secretary of both Wynnefield and National devoted some time to Wynnefield; two other employees worked entirely on matters pertaining to Wynnefield; and regular office personnel including bookkeepers and 0tenographer0 performed 0ervice0 for Wynnefield. It was originally agreed that Wynnefield would pay Builders $1,000 a month for its various services, and such amounts were actually paid for the years prior to the taxable years. At some time during the taxable years, Weinberg pointed out that the job required a great deal more of his services than had been anticipated, and it was agreed that for the fiscal years ended April 30, 1959 and 1960 Wynnefield would pay Builders $34,500 and $34,250, respectively, in lieu of the previously agreed $1,000 a month. The book entries of Wynnefield show periodic payments of $1,000 a month for office services expense during the year ended April 30, 1959, and similar payments for eight months of the year ended April 30, 1960 together with a payment of $10,000 on*118 December 24, 1959. In addition, the books show year-end accruals of office services expense for the years ended April 30, 1959 and April 30, 1960, in the amounts of $22,500 and $16,250, respectively. The amounts accrued have actually been paid. The Commissioner disallowed the deductions of $34,500 and $34,250 claimed by Wynnefield for "office services" in its returns for the fiscal years ended April 30, 1959 and April 30, 1960, respectively. Other office expenses were deducted by Wynnefield in its returns, as follows: Expense4-30-594-30-60Accounting$1,326.50$1,315.00Office supplies and expense580.5292.55Postage98.0024.00Telephone and telegraph810.34325.38Stationery and printing109.1117.88Wynnefield also included in construction costs in its income tax returns service fees of $209,493.76 and $76,225.29 charged by National for fiscal years ended April 30, 1959 and April 30, 1960, respectively. The subcontractor costs incurred by National were passed on to and paid directly by Wynnefield. The only income reported on National's returns was the service fees which it charged Wynnefield. The service fees were based upon the out-of-pocket*119 expenses of National plus 50 percent of the profits on houses sold. Opinion RAUM, Judge: 1. Interest deduction. The principal question before us is whether petitioner corporation (Wynnefield) is entitled to interest deductions in respect of amounts paid by it to Wynnefield Investors, an unrelated partnership, which had advanced $300,000 to Wynnefield. In accordance with an agreement between the parties Wynnefield repaid that $300,000 together with the amounts in question which were characterized in the agreement as being "in lieu of interest". Although such amounts were referred to in Wynnefield's returns as "Participants Share of Income", it seeks deduction therefor as "interest" paid within Section 163(a) of the 1954 Code, which grants a deduction for "all interest paid or accrued within the taxable year on indebtedness". Interest has been defined as "compensation for the use or forbearance of money", Deputy v. DuPont, 308 U.S. 488, 498, and the mere fact that an amount is labeled as being "in lieu of interest" does not deprive it of its character as interest provided*120 that there is a bona fide indebtedness and that the amount is paid for the use of the borrowed funds. Cf. Dorzbach v. Collison, 195 F. 2d 69, 72 (C.A. 3). In urging approval of the disallowance the Commissioner contends that the $300,000 advanced to the corporation represented an equity interest therein, that the corporation did not incur any indebtedness, and that the payments in question constituted dividends either to Wynnefield Investors or to Weinberg and Madway. We reject these contentions, and hold that there was a bona fide indebtedness in the amount of $300,000 from petitioner to the partnership. The following factors have been considered as relevant in determining whether a particular advance represents a genuine indebtedness upon which deductible interest is paid or a contribution to capital forming the basis for nondeductible distribution of dividends ( Wilbur Security Co. v. Commissioner, 279 F. 2d 657, 662 (C.A. 9), affirming, 31 T.C. 938, 948): (1) The name given to the certificates evidencing the indebtedness. (2) The presence or*121 absence of a maturity date. (3) The source of the payments. (4) The right to enforce the payment of principal and interest. (5) Participation in management. (6) A status equal to or inferior to that of regular corporate creditors. (7) The intent of the parties. (8) Capitalization. (9) Identity of interest between creditor and stockholder. (10) Payments of interest only out of dividends. (11) Whether or not the corporation could have obtained loans from outside lending institutions. See also O. H. Kruse Grain & Milling v. Commissioner, 279 F. 2d 123, 125-126 (C.A. 9); 2554-58 Creston Corp., 40 T.C. 932, 936. The question whether advances are debt or equity is one of fact to be decided on the basis of the particular circumstances involved in each case. John Kelley Co. v. Commissioner, 326 U.S. 521. No one factor is likely to be conclusive, and after examining the record in the light of all of these factors, we have concluded that the advances herein represented a bona fide loan. Each of the two instruments evidencing the advances is entitled "Promissory Note", *122 and the agreement between Wynnefield, Wynnefield Investors and the Guarantors refers to the proposed advances as a "loan" rather than an equity investment. While the name given to the advances is not determinative, it is deserving of some weight, and takes on added significance in view of the fact that the transaction between Wynnefield and the partnership was completely at arm's-length and tax considerations do not appear to have played any role in the determination of the terminology to be used. Although there was no fixed maturity date at which the entire amount of principal and "interest" became due, there was a fixed date, December 31, 1957, after which any member of Wynnefield Investors could have demanded a return of his investment. At the time of such demand he would have been entitled to a share of the $500 for each house that had been sold in addition to the return of the principal amount which he had invested. In any event, it is clear that the parties contemplated a steady and complete repayment of the advance within a relatively short period of time. And, upon failure to complete the project within the time originally contemplated, the return to Wynnefield Investors*123 was increased to $575 on each remaining house. The source of the payments, assuming that none of the alternative provisions were brought into effect, was to be the proceeds from the sale of each house. The payments were not to be made only out of earnings and profits, since there was no requirement that the houses be sold at a profit or that Wynnefield have earnings out of which to make the payments. Thus, the recovery of the amount due by the partnership depended not on the success of Wynnefield but merely upon completion of the project, whether at a profit or at a loss. If the decision not to sell houses was made then Wynnefield Investors would have obtained repayment of its advance together with a five or ten percent return. And, although the need did not arise, the partnership appears to have had the right to enforce payment of the amount due after the sale of each house from the proceeds thereof. Neither the partnership nor any of its members had rights of any nature to participate in the management of either Wynnefield or National. These corporations were owned or controlled by Weinberg and Madway, neither of whom were partners in Wynnefield Investors. Although a nonshareholder*124 can make a capital contribution to a corporation, it is an unusual situation particularly when there is no family relationship or other special reason for doing so. No such reason appears in the present case. Contrast Burr Oaks Corp., 43 T.C. 635, 648, affirmed, 365 F. 2d 24 (C.A. 7). The advance made by the partnership was not subordinated to loans of any other ordinary creditors of Wynnefield. While it was unsecured, it was guaranteed by five persons including both Weinberg and Madway, who had a combined net worth of slightly less than $2,000,000. In addition, there was no identity of interest between creditor and stockholder. Indeed, no stockholder of Wynnefield was a partner in Wynnefield Investors and no partner therein was a stockholder of Wynnefield. This is a factor of great weight in this case. Cf. Leach Corporation, 30 T.C. 563, 578-579. The Commissioner relies on the two remaining factors, arguing that all of the above is either neutral or can be explained away. We do not find this to be the case. One factor relied upon by the Commissioner is the inability of Wynnefield to obtain the $300,000 from banks. But this circumstance*125 is offset by the fact that the loan was obtained in an arm's-length transaction from an outside source that was otherwise unconnected with Wynnefield. The principal argument advanced by the Commissioner is based on the "thin" capitalization of Wynnefield, which had capital stock with a book value of only $2,500. However, Wynnefield's land had appreciated from about $300,000 to approximately $700,000 by the time of the loan from the partnership, a circumstance that affects the "thin" capitalization point. Cf. Earle v. Jones, 200 F. 2d 846 (C.A. 9). In any event, however, "thin" capitalization is but one of the numerous criteria to be taken into account, and if the Court is satisfied on the entire record that there is a bona fide indebtedness, as is the situation here, the "thin" capitalization point must give way to other considerations. See 2554-58 Creston Corp., 40 T.C. 932, 937, fn. 3. Wynnefield Investors intended to make a loan, not an equity investment, and considering the entire record in the light of all relevant factors, we find that the advances made by Wynnefield*126 Investors constituted a bona fide loan. The Commissioner has argued in the alternative that if the advances were loans they were in fact made to Weinberg and Madway who then made a capital contribution to Wynnefield. If that were the situation the payments on the notes would be dividend distributions to Weinberg and Madway, and any interest paid to the partnership would be deductible by them as individuals. While such result might be reached in some circumstances it would depend upon the facts of the particular case; however, we think that no such situation was intended by any of the parties and that no such legal relationships were in fact created. Although Weinberg and Madway guaranteed the loan, it was similarly guaranteed by the promoters, the three "Other Partners" in Wynnefield Investors. And, even if we were to find that there was an understanding that Weinberg and Madway would make good any losses sustained by the "Other Partners", we hold that on this record there was a bona fide loan made by the partnership and that loan was made directly to Wynnefield rather than to Weinberg and Madway. 2. Office Services deduction. Although the Commissioner originally disallowed in*127 their entirety deductions for "office services" in the amounts of $34,500 and $34,250 claimed for the fiscal years ended April 30, 1959 and 1960, respectively, he has since conceded on brief that $1,000 a month, or $12,000, should be allowed for each of the years. We hold that petitioner was entitled to deduct the full amounts claimed. The liability to pay the increased amounts was negotiated in arm's-length bargaining, and since petitioner was on an accrual basis it was entitled to accrue those portions which were unpaid at the end of each year and which were in fact paid thereafter. Although the record is not completely satisfactory in respect of this issue, we are reasonably convinced that the deductions claimed actually reflected fees for services rendered that were not otherwise compensated for and that were not unreasonable in amount. In the circumstances, this is not a case for the application of the rule of Cohan v. Commissioner, 39 F. 2d 540, 544 (C.A. 2), as suggested by the Government on brief, and the deductions claimed should have been allowed in full. Decision will be entered under Rule 50. Footnotes*. Sister of Harry and Samuel Madway.↩1. Although the agreement here appears to state that the "Other Partners" were the five "Guarantors," only Sylk, Horowitz and Chanoff were "Other Partners." Weinberg and Madway were Guarantors, but not partners in Wynnefield Investors.↩